# United States Court of Appeals for the Federal Circuit

———————————

**RICHARD LEWIS KATZIN, ESTATE OF ANNETTE KATZIN, ESTATE OF MARY BETH KATZIN-SIMON, ROSEMARIE KJELDSEN,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

———————————

2016-2636

———————————

Appeal from the United States Court of Federal Claims in No. 1:12-cv-00384-CFL, Judge Charles F. Lettow.

———————————

Decided: November 19, 2018

———————————

ROBERTO EDUARDO BERRIOS FALCON, Berrios Falcon, LLC, San Juan, PR, argued for plaintiffs-appellees.

MICHAEL THOMAS GRAY, Environment and Natural Resources Division, United States Department of Justice, Jacksonville, FL, argued for defendant-appellant. Also represented by JEFFREY H. WOOD, Washington, DC.

———————————

Before PROST, *Chief Judge,* NEWMAN and LINN, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* LINN.

Dissenting opinion filed by *Circuit Judge* NEWMAN.

LINN, *Circuit Judge.*

The United States appeals from a final decision after trial by the Court of Federal Claims ("Claims Court"), holding that the government effected a physical taking of a ten-acre peninsula on the island of Culebra in Puerto Rico, when the U.S. Fish and Wildlife Service ("F&WS") faxed its claim of ownership to a gun mount located on the peninsula to a potential purchaser. *Katzin v. United States*, 127 Fed. Cl. 440 (2016) ("*Katzin II*"); *see also Katzin v. United States*, 120 Fed. Cl. 199 (2015) ("*Katzin I*") (denying summary judgment to the United States). Because the fax was not a physical taking of Appellees' land, we reverse.

## I. BACKGROUND

### A. Facts

The Claims Court admirably described the history of the disputed parcel. *Katzin II*, 127 Fed. Cl. at 446–57. We report only that portion of the history relevant to our decision.

Culebra is the largest in a group of islands just east of Puerto Rico. Prior to 1898, Culebra belonged to the Kingdom of Spain. In 1887, Spain initiated a survey ("1887 Survey"), the resulting map of which is reproduced below in *Figure 1*, dividing the property into privately owned parcels. The peninsula in the eastern section of Parcel 24 roughly represents the land at issue in this litigation. Under Spanish law at that time, the "maritime terrestrial zone" surrounding the island—"the area of the coasts or seashore . . . that is washed by the sea in its ebb and flow, where the tide is perceptible, or the highest



**Figure 1 - 1887 Survey**

tidal waves in stormy weather when the tide is not perceptible"—was held by the Spanish government in the public domain. *Id.* at 446–47.

In 1898, Spain transferred all lands owned by the Spanish government on Culebra to the United States. Treaty of Peace Between the United States of Am. and the Kingdom of Spain, 30 Stat. 1754 (Apr. 11, 1899) ("Treaty of Paris"). This included the maritime-terrestrial zones. In 1901, President Roosevelt issued a general order, and in 1903 a proclamation, that all public lands on Culebra would be reserved for Naval purposes.

The Treaty of Paris did not affect the privately owned parcels. In 1903, several of the privately owned parcels, including Parcels 24 and 25, were combined into a single tract and registered with the Registry of Property of Puerto Rico ("Registry") as Property No. 117 ("Buena Vista"). On June 28, 1903, the owners of the tract signed a deed of sale, transferring a 2.25-acre plot to the Navy. It was registered on June 29, 1903. The Registry de-

scribes the plot as "bounded to the North by [property owned by] Mr. Antonio Lugo and the sea on a tip of land; to the East by the sea; and to the South and West by the main property from which it is segregated." *Katzin II*, 127 Fed. Cl. at 449–50. This description placed the transferred plot within former Parcel 25 on the 1887 Survey. *Id.* at 449. Also on June 29, the same owners and the Navy signed an "Agreement of Sale," describing the metes of the property in the same way, but indicating its location as within "Plot Number 24, Official Chart of Culebra, U.S.W.I." *Id.* at 450. The Navy traces the location of the gun mount to this Agreement of Sale, and has consistently referred to the location of the transferred plot as within former Parcel 24. *Id.* at 457. The dispute in this case revolves around the location and ownership of this transferred plot. Hereinafter, we refer to this uncertainly located plot as the gun mount site.

After several conveyances, Plaintiffs Dr. and Mrs. Katzin became owners of an undivided 50 percent interest



**Figure 2 — Navy Map 323**

in Parcel 4, which roughly corresponds to Parcel 24 on the 1887 Survey, and Plaintiff Rose Marie Kjeldsen Winters became the owner of the remaining 50 percent. *Id.*

In 1972, the General Services Administration ("GSA") took control of Navy lands on Culebra. GSA transferred the land to the F&WS, using Navy Map No. 323. *See Figure 2.* Navy Map No. 323 showed an overlay of the 1887 Survey with highlights showing Navy ownership of a coastal strip around the southern and eastern coast of the island, and a gun mount location on the southern end of the peninsula. *Id.* at 463. The F&WS published notice in the Federal Register that it would prepare a Draft Environmental Impact Statement on the transfer of lands from the Navy to the F&WS, as well as a Final Environmental Impact Statement. Intent to Prepare an Envt'l Impact Statement on the Proposed Disposition and Administration of Lands on the Islands of Culebra and Culebrita, 45 Fed. Reg. 16,358-01 (Fish & Wildlife Serv. (Mar. 13, 1980)); Availability of Final Envt'l Impact Statement, 46 Fed. Reg. 50,421-01 (Fish & Wildlife Serv. (Oct. 13, 1981)); Record of Decision on Proposed Disposition and Administration of Lands Declared Excess by U.S. Navy on the Islands of Culebra and Culebrita in Puerto Rico, 47 Fed. Reg. 11,114-02 (Fish & Wildlife Serv. (Mar. 15, 1982)). According to the Claims Court, the Draft and Final Environmental Impact Statements included a map of the property to be transferred, including Tracts 1e (the coastal strip) and 1f (the gun mount on the northeastern side of the peninsula). *Katzin II*, 127 Fed. Cl. at 463–64.

In 1985, the F&WS surveyed the eastern coast of Culebra. The survey labels several points on the boundaries



**Figure 3 — 1985 F&WS Survey Plat**

of the F&WS property and includes labels for Tract 1f and 1e. *See Figure 3.* The survey plat shows Tract 1f bounded by points 606, 607, 609, 610, and 611. *Id.* at 464–65. The F&WS placed signs at some of the points on the plat that prohibited entry. *See Figure 4.* In 2012 and 2013, a F&WS representative located a marker at point 606, and other markers were found at points 600, 601, 602, 603, 605, 612, 613, 614, 617, and 619.



**Figure 4 — F&WS sign**

In 1987, Edward Borges, the attorney representing the Katzins' neighbor Culebra Enterprises Corporation, wrote to the F&WS seeking resolution of boundary uncertainties between the maritime-terrestrial zone and Culebra Enterprises' land. Specifically, Borges explained that the boundary lines defined in the 1985 F&WS survey at some points did not secure all the sensitive wetlands for the F&WS and in other spots encroached beyond the high-water mark of the ocean and encroached on land that Culebra Enterprises claimed as its own. *Id.* at 465.

Borges proposed that the F&WS take ownership of all the wetlands, and that Culebra Enterprises take ownership of all other areas outside the maritime zone. *Id.* The letter included an aerial photograph of Culebra, with a tracing matching the 1985 F&WS Survey, including the numbered markers defining an enclosed polygon on the peninsula at the east of former Parcel 24, as seen in Figure 5 below.

In April 1987, Dr. Katzin wrote to the F&WS, identifying himself as owner or part-owner of land "from station 616 at the southern end of the refuge north to a point



**Figure 5 — Aerial Photograph Attached to Borges' Letter to F&WS**

midway between stations 614 and 613," and "an undivided half interest in the property between that point and Mr. Mailloux's property at station 602 to the north." J. App'x 2936. Dr. Katzin also wrote that "our boundary situation has many similarities to that of Culebra Enterprises and I would like to explore with you the possibilities of a similar solution." *Id.* The F&WS replied that

they would consider an exchange of lands to resolve the ambiguity.

Plaintiffs listed Parcel 4 for sale, and on March 23, 2006, William Klaber signed a purchase agreement to buy it for $4 million. *Katzin II*, 127 Fed. Cl. at 467. Mr. Klaber deposited $50,000 in earnest money, and the parties scheduled a closing for June 30, 2006. The agreement provided for a return of the deposit if the buyer discovered that "any fact related to zoning, title and land survey, current easements, real estate taxes and assess-



**Figure 6 — Tracing of 1887 Map with F&WS Property Claims, attached to June 22, 2006 E-mail from the F&WS to Mr. Klaber's Attorney.**

ments or legal access are not as represented." *Id.* In June 2006, Mr. Klaber asked his attorney, Claudia Motta, to find a way to "get . . . out of the deal" to purchase Parcel 4. *Id.* The parties' communications reveal a concern about potential government claims on the property. *Id.* On June 15, 2006, Ms. Motta e-mailed John Beasley, a F&WS representative, to ask about the F&WS's claims on Parcel 4. *Id.* at 468.

On June 22, Mr. Beasley replied by faxing several documents ("Beasley fax"), including a tracing of the 1887 Survey map with the F&WS parcel numbers added, including Tract 1e, which Mr. Beasley described as "the maritime zone," and Tract 1f, shown as a square north of

the peninsula, and described as "an old gun mount site purchased by the Navy in 1903 from Escolastico Mulero." J. App'x at 3115, 3117; *see Figure 6*.

On June 28, 2006, Ms. Motta communicated to Plaintiffs that Mr. Klaber would not buy Parcel 4. Thereafter, several potential buyers refused to buy the property.

## B. Procedural History

Plaintiffs brought suit in the Claims Court against the United States, alleging that the Beasley fax effected a physical taking of the 10.01-acre peninsula in Parcel 24. *Katzin II*, 127 Fed. Cl. at 445. After trial, the Claims Court held that Plaintiffs' takings claim was not beyond the statute of limitations because it did not accrue at any time prior to the Beasley fax in 2006. This was so, the Claims Court held, because even though Plaintiffs or their predecessors in interest "knew or had reason to know of the government's claims to the maritime zone and the former gun mount site prior to the contract with Mr. Klaber," the "disputes over ownership rights prior to June 2006 were never refined to the point of interfering with plaintiffs' use and enjoyment." *Id.* at 473–74. The Claims Court explained that the "only evidence" of government interference was the placement of survey markers and wildlife refuge signs on the property, but the court found that those markers and signs "could have related to the maritime zone, which plaintiffs concede the government controls," and therefore did not interfere with Plaintiffs' property. *Id.* at 474 n.17. Separately, the Claims Court also held that Plaintiffs' title to Parcel 4 included title to the 10.01-acre peninsula, and that the government's 2.25-acre gun mount was not located on the peninsula. *Id.* at 476–79.

Finally, the Claims Court concluded that the Beasley fax effected a non-possessory physical taking of the entire

10.01-acre peninsula.[1]  The Claims Court understood that, in the case of a non-possessory taking, "governmental action can effect a taking when it prohibits or prevents a landowner from exercising his or her property rights because of a governmental claim of ownership of those rights." *Id.* at 479.  The Claims Court reasoned that the government "appropriated plaintiffs' property rights such that they were not able to sell the parcel free of the government's claims," and that this was a physical taking requiring just compensation for the appropriation of the 10.01-acre peninsula.  *Id.* at 482.  The Claims Court set the value of all of Parcel 4 at $4 million, based on Mr. Klaber's contract value, and awarded a fraction of that value corresponding to the acreage of the peninsula, to arrive at a reasonable compensation amount of $610,962.97 plus interest.  *Id.* at 483.

## II. DISCUSSION

### A.  Standard of Review

We review a final decision of the Claims Court by examining legal conclusions de novo and factual findings for clear error.  *Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1365 (Fed. Cir. 2004).  Whether a Fifth Amendment taking has occurred is a question of law, based on factual determinations.  *Id.*

---

[1]  The Claims Court explained that the government's actions with respect to the gun mount site implicated the entire 10.01-acre peninsula because the inconsistency of the government's position of *where* the gun mount was located on the peninsula required the court to "accept—as the plaintiffs and any prudent buyer would have to do—that the relevant governmental action is a claim of ownership, and thereby a permanent taking, of the entire 10.01-acre peninsula." *Katzin II*, 127 Fed. Cl. at 481.

A claim under the Tucker Act, 28 U.S.C. § 1491, in the Claims Court must be brought "within six years after such claim first accrues." 28 U.S.C. § 2501. We review whether a claim is barred by the statute of limitations de novo, and, as usual, review underlying fact-findings for clear error. *Brown v. United States*, 195 F.3d 1334, 1337 (Fed. Cir. 1999).

A physical takings claim accrues when the scope of what is taken is fixed, *see Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed. Cir. 2005)(quoting *Martinez v, United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc)) (stating that a claim under § 2501 accrues "when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money"), and the plaintiff knew or should have known of the acts that fixed the government's alleged liability, *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988). The Tucker Act statute of limitations is jurisdictional; we must therefore determine whether Plaintiffs' claims are timely before proceeding to the merits of the takings claim. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136 (2008). Because the Tucker Act's statute of limitations is jurisdictional, the plaintiffs bear the burden of proving that their claims are not time-barred. *Mildenberger v. United States*, 643 F.3d 938, 944–45 (Fed. Cir. 2011); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998).

## B. Merits

This case presents three distinct issues: (1) whether the Claims Court erred in holding that Plaintiffs' takings claim was not jurisdictionally time-barred; (2) whether the Claims Court erred in holding that the communication from the F&WS to Mr. Klaber's representative was a physical taking of the 10.01-acre peninsula; and (3) whether the Claims Court clearly erred in holding that

Plaintiffs had proven their ownership interest in the peninsula here at issue. We address the first two issues below.

## 1. Statute of Limitations

The Claims Court concluded that nothing prior to the 2006 Beasley fax began the clock for Plaintiffs' takings claim because the property dispute about the gun mount was "never refined to the point of interfering with plaintiffs' use and enjoyment" of the allegedly taken land. *Katzin II*, 127 Fed. Cl. at 473–74.

The government contends that if any physical taking occurred, it was when the F&WS placed physical signs on the peninsula demarcating the government's ownership claim. The 1985 Survey plat shows Tract 1f as an enclosed polygon, defined by plot markers 606, 607, 609, 610, and 611. *See* Figure 3. Marker 606 was found in the location corresponding to its location on the plat, but none of the other markers allegedly defining the polygon were found. The government argues that there is no evidence that the remaining markers were not also placed on the property according to the locations indicated on the 1985 Survey plat, and that the markers' express prohibition of access constituted an interference with Plaintiffs' property with respect to Tract 1f. The government argues that Plaintiffs knew of the markers, as evidenced by Dr. Katzin's reference to the marker numbers in his 1987 correspondence with the F&WS. From Dr. Katzin's knowledge, the government concludes that the markers cannot be interpreted as anything other than a physical encroachment of *both* the gun mount and the maritime zone, and that therefore Plaintiffs' takings claim is time-barred. The government further argues that Navy Map No. 323, the "official map for the transfer" of lands on Culebra from the Navy to F&WS, showed a government-owned gun mount, and that communications between govern-

ment branches also showed the gun mount as government property.

Plaintiffs respond that their takings claim did not accrue in 1987 for two reasons. First, Dr. Katzin claims that he did not have notice of the government's defined assertion of title to the polygonal gun mount site in 1987. He asserts that the only map then in his possession, Navy Map No. 323, showed the gun mount site within the maritime-terrestrial zone, and not as a discrete plot within Plaintiffs' property. Second, Plaintiffs argue that the only point of contention between the parties in 1987 was over the extent of the maritime-terrestrial zone, as shown by the lack of any discussion of a gun mount site in the 1987 correspondence and the 1995 Agreement of Exchange.

The 1987 placement of the signs and correspondence did not start the running of the statute of limitations. We see no error in the Claims Court's finding that the sign at point 606 and others along the coast could have related to the maritime zone. Even assuming that all the numbered markers were placed according to the 1985 F&WS survey, those markers would not necessarily restrict Plaintiffs' access to the polygonal gun mount site. Because the markers generally follow the coastline and thus reasonably relate to the maritime zone, there is no indication that the government interfered with Plaintiffs' access or enjoyment of the land identified as the gun mount site in the F&WS's email to Mr. Klaber's attorney. The government does not dispute that *if* the markers relate to the maritime zone, then they did not start the clock on the statute of limitations.

The 1987 correspondences between Dr. Katzin and the F&WS alone, or in combination with the physical signs, also did not effect a taking. The 1987 correspondences were clearly focused on resolving the boundaries of the maritime-terrestrial zone. Dr. Katzin's letter to the

F&WS states that "our boundary situation has many similarities to that of Culebra Enterprises and I would like to explore with you the possibilities of a similar solution." J. App'x 2936. The Culebra Enterprises solution only addressed the maritime zone boundary: the goal was to redraw the maritime zone boundaries so that the protected wetlands would all belong to the F&WS, and lands beyond the maritime zone would belong to Culebra Enterprises. Neither the Culebra Enterprises correspondence nor Dr. Katzin's correspondences with the F&WS addressed the gun mount site or any other non-coastal land.

Even if Plaintiffs "knew or had reason to know of the government's claims to the maritime zone *and* the former gun mount site prior to the contract with Mr. Klaber," *Katzin II*, 127 Fed. Cl. at 473 (citing Dr. Katzin's 1987 correspondences with the F&WS)(emphasis added),[2] both parties agree that a mere government assertion of ownership does not constitute a taking. Br. of Appellant at 41–42 and n.3; Br. of Appellee at 43 (citing *Katzin I*, 120 Fed. Cl. at 214 (citing *Cent. Pines Land Co. v. United States*, 107 Fed. Cl. 310, 325 (2010)). It logically follows that the government's internal documents here also do not constitute a taking, as they do not do anything other than confirm the government's assertion of ownership.

Finally, we note that the scope and location of the government's alleged taking was not fixed in 1987 as the mostly square northerly gun mount site shown in the F&WS's email to Mr. Klaber's attorney in 2006. To the

---

[2] The government reasons that Dr. Katzin knew of the government's assertion of ownership because: Dr, Katzin's letter to the F&WS references the marker numbers from the 1985 Survey, and that that survey shows a horizontal line between points 606 and 611, defining the polygonal gun-mount site allegedly taken.

contrary, Navy Map No. 323 showed a gun mount site within the maritime-terrestrial zone, and the 1985 Survey showed a polygonal gun mount site labeled "Tract 1f" defined by the F&WS signs. Neither of those documents clearly corresponds to Plaintiffs' current takings claim.

We therefore conclude that Plaintiffs' takings claim as to the square northerly gun mount site shown in the 2006 email is not precluded by the Tucker Act's statute of limitations.

## 2. Physical Taking

We turn now to the Claims Court's determination that a physical taking of the entire 10.01-acre peninsula occurred when F&WS sent the Beasley fax to Mr. Klaber's attorney detailing the government's assertions of ownership.

The Claims Court recognized that the fax was not a physical occupation of plaintiffs' property. *Katzin II*, 127 Fed. Cl. at 480. Nevertheless, the Claims Court explained that a non-possessory "physical" taking occurs when governmental action "prohibits or prevents a landowner from exercising his or her property rights because of a governmental claim of ownership of those rights." *Id.* at 479. The Claims Court concluded that the Beasley fax did just that: "the government has made a claim of ownership to part of plaintiff's property, and it has communicated that claim to prospective purchasers of plaintiffs' land, which actions plaintiffs claim have prevented them from exercising their right to sell Parcel 4." *Id.* at 480. The Claims Court therefore concluded that the Beasley fax was a physical taking requiring just compensation. *Id.* at 482.

A physical taking is a specialized type of governmental action that requires compensation *per se*, and we draw a bright line between the analysis applicable to alleged physical takings and that applicable to regulatory tak-

ings.  *See Tahoe-Sierra Preserv. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323–24 (2002) ("For the same reason that we do not ask whether a physical appropriation advances a substantial government interest or whether it deprives the owner of all economically valuable use, we do not apply our precedent from the physical takings context to regulatory takings claims."). "A physical taking generally occurs when the government directly appropriates private property or engages in the functional equivalent of a 'practical ouster of [the owner's] possession.'" *Washoe Cty., Nev. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) (brackets added in *Lucas*).

In addition, two categories of regulatory actions will generally be deemed to be *per se* takings: where the government action requires "an owner to suffer a permanent physical invasion of her property" and where government "regulation[s] completely deprive[] an owner of all economically beneficial use of her property." *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1289 (2008) (internal citations and quotation marks omitted). A permanent physical invasion "is perhaps the most serious form of invasion of an owner's property interests," and is usually such "an obvious fact that [it] will rarely be subject to dispute." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, 437 (1982). The deprivation of all economically beneficial use of property via regulation is a "rare" and "extraordinary circumstance." *Lucas*, 505 U.S. at 1017–18.[3]

---

[3]   We discuss *per se* regulatory takings in part because the Claims Court relied heavily on *Yuba Goldfields*, which we have categorized as a regulatory takings case, *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1309 (Fed. Cir. 2015), and because Judge Newman's Dissent

"Outside these two relatively narrow categories . . . regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005); *see also Casitas*, 543 F.3d at 1289. The parties in this case have not asked us to analyze this claim under the *Penn Central* framework.

Plaintiffs argue that the Claims Court was correct that the Beasley fax "in fact appropriate[d] plaintiffs' property rights" because Plaintiffs "could not offer unfettered title to potential buyers" due to the government's claims. *Katzin II*, 127 Fed. Cl. at 481. According to Plaintiffs, this constitutes a non-possessory physical taking within the scope of *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed. Cir. 1983). Plaintiffs also argue that the Claims Court determination that the fax rendered the property inalienable is supported by the record.

We hold that the government's mere sharing of information about its claim of ownership to real property with a third party does not constitute a physical taking (or a *per se* regulatory taking) of that property. The Claims Court erroneously explained that government action categorically effects a taking when it "prohibits or prevents a landowner from exercising his or her property rights because of a government claim of ownership of those rights." *See Katzin II*, 127 Fed. Cl. at 479. This broad standard is contrary to the circumscribed role that the Supreme Court assigned to *per se* takings, as described above.

---

premises its holding of a *per se* taking because of the loss of "all economically beneficial uses" of the property, *Dissent* at 9 (citing *Lucas*, 505 U.S. at 1017), which is a *per se* regulatory analysis.

The Beasley fax does not constitute a physical taking or a *per se* regulatory taking under Supreme Court precedent. By sending the Beasley fax, the government did not: physically occupy some part of Plaintiffs' property, require Plaintiffs to suffer a permanent physical invasion, directly appropriate Plaintiffs' property, effect the functional equivalent of an ouster of Plaintiffs' possession, or deprive Plaintiffs of all economically beneficial use of Plaintiffs' property. Indeed, the Beasley fax did nothing more than disseminate information about the government's property claims to Mr. Klaber and other potential buyers; it did not actually change any rights in any part of Parcel 4. At most, the Beasley fax disseminated information about the government's claims, and the market incorporated that information into its valuation of the property. This lowering of the market value is a far cry from a total deprivation of all economically beneficial use of Parcel 4. The lowering of the market value without a legal restraint on alienability generally does not constitute a physical or *per se* regulatory taking'. *Cf. Dimare Fresh*, 808 F.3d at 1310 ("The fact that the market *chooses* to incorporate all available information, without more, cannot form the basis of a regulatory takings claim."); *id.* at 1311 ("Unlike *A&D Auto Sales* and *Yuba*, in the case before us, there is not a prohibition or any coercive government action restricting the Tomato Producers from selling, disposing, or using their produce however they desire. What Tomato Producers effectively request is for this court to find that government action devoid of coercion, legal threat, regulatory restriction, or any binding obligation may effect a regulatory taking. We will not."); *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 15 (1984) ("[I]mpairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking. At least in the absence of an interference with an owner's legal right to dispose of his land, even a substantial reduction of the attractiveness of the property to potential purchasers does not

entitle the owner to compensation under the Fifth Amendment." (footnote and citations omitted))[4].

Plaintiffs' and the Claims Court's reliance on *Yuba Goldfields*, 723 F.2d 884, is also misplaced. In *Yuba Goldfields*, plaintiff Yuba Goldfields owned the right to dredge for minerals located on property owned by the United States. 723 F.2d at 885. In 1975, the government told Yuba that it had no more rights to the minerals on the property, that Yuba would be held accountable for all minerals extracted, and that the United States would enforce its property rights against Yuba. *Id.* at 885–86. We held that Yuba could argue that the government took its property, without testing the government's resolve by renewing its activities and thereby being physically restrained. *Id.* at 887–88. *Yuba Goldfields* cannot support the Claims Court's holding in this case for a number of reasons. That case held, in relevant part, that "[n]either physical invasion nor physical restraint constitutes a *sine qua non* of a constitutionally controlled tak-

---

[4]   The Dissent states that *Kirby Forest* "stands for the opposite proposition," *Dissent* at 9–10, but the Supreme Court there found no taking prior to the condemnation, noting that "The Government never forbade petitioner to cut the trees on the land or to develop the tract in some other way." 467 U.S. at 15. Moreover, the Court explained that the Government did not "abridge petitioner's right to sell the land . . . . [This is true even though it] is certainly possible, as petitioner contends, that the initiation of condemnation proceedings, publicized by the filing of a notice of lis pendens, reduced the price that the land would have fetched." *Id.* Similarly, here, the Government did not actually restrict Plaintiffs' rights to make use of the property, and the potential reduction in market price from the Government's claims does not constitute a physical or *per se* regulatory taking.

ing." 723 F.3d at 887. First, to support that holding, this court cited to *Penn Central*, which set out the scheme for *regulatory*, not physical, takings. *See Dimare Fresh*, 808 F.3d at 1309 (characterizing *Yuba Goldfields* as discussing a regulatory takings claims). As the Supreme Court explained in *Tahoe-Sierra*, precedent from one form of taking cannot support the other. 535 U.S. at 323. Moreover, and importantly, *Yuba Goldfields* never went so far as to say that any interference with property interests arising out of a government claim of ownership was a *per se* taking. The government there did not merely claim ownership of the minerals—it explicitly prohibited Yuba from making any use of the property (i.e. extracting the minerals), and threatened prosecution if Yuba, in fact, made use of the property.

The Beasley fax amounts to neither a prohibition on access nor a threat of enforcement. The fax did not prohibit Plaintiffs from taking any action with respect to the gun mount or the peninsula. The Beasley fax merely reasserted claims of ownership that the government had been making for decades. The fax did not amount to a physical taking.

The Dissent insists that the government deprived Plaintiffs of "all economically beneficial uses" of the property "based on the government's assertions of ownership." *Dissent* at 9, 11. The government, however, has been asserting its ownership of a gun mount on the peninsula since at least the 1980s, and, as the Claims Court found, Dr. Katzin knew of the government's claims of ownership since at least 1987. The only government action Plaintiffs allege gave rise to a physical taking is the Beasley fax. But the Dissent does not, and cannot, explain how the Beasley fax constitutes a physical taking under the Supreme Court's and our precedent, or how the Beasley fax itself—rather than the government's earlier assertions of ownership—deprived Plaintiffs of all economically viable use of their property.

CONCLUSION

Because the Beasley fax was not a physical taking, we reverse. As the Dissent correctly points out, the heart of this dispute is the title to the gun mount site. However, even if Plaintiffs were to establish title to the peninsula, because the Beasley fax was not a physical taking, Plaintiff is not entitled to just compensation under a physical takings theory. We therefore need not and do not address the government's additional arguments that Plaintiffs did not prove ownership of the peninsula or that the Beasley fax did not in fact render Parcel 4 inalienable.

We note that this dispute spans over a hundred years of surveys, assertions, and communications, and we encourage both parties to seek clarity over the property in question through settlement or other available avenues of resolution.

**REVERSED**

COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

---

**RICHARD LEWIS KATZIN, ESTATE OF ANNETTE KATZIN, ESTATE OF MARY BETH KATZIN-SIMON, ROSEMARIE KJELDSEN,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2016-2636

---

Appeal from the United States Court of Federal Claims in No. 1:12-cv-00384-CFL, Judge Charles F. Lettow.

---

NEWMAN, *Circuit Judge*, dissenting.

I respectfully dissent. The Court of Federal Claims ("CFC"), on exhaustive analysis, traced title to the Katzin and Winters ("Katzin") property back to the Spanish ownership of Puerto Rico.[1] The court inspected the deeds recorded in the Registry of Property of Puerto Rico, received testimony from experts, and in a full and lengthy opinion with maps and other documentary detail, found that the Katzins' "title to Parcel 4 includes title to the

---

[1] *Katzin v. United States*, 127 Fed. Cl. 440 (2016) ("CFC Op.").

peninsula, subject to the maritime terrestrial zone and rescue easement that all parties concede are controlled by the government." CFC Op. at 478. With this confirmation of the Katzins' title to land over which the government asserts ownership, the takings inquiry was resolved in favor of the Katzins. CFC Op. at 484.

The United States appeals this decision, but my colleagues decline appellate review of the Court of Federal Claims' findings of title and ownership. Resolution of the takings claim requires resolution of ownership of the land. Despite the Katzins' registered deed, the United States asserts that the government, not the Katzins, owns the entirety of the 10.01 acre peninsula, as well as the government's undisputed ownership of a 2.25 acre gun mount site at an unknown location. The government has so advised potential purchasers and has eliminated all possibility of sale of the land. That is what this case is about, for the right to sell one's property is a fundamental tenet of ownership.

The Court of Federal Claims applied classical takings analysis: "This court has developed a two-step approach to takings claims. 'First, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a "stick in the bundle of property rights."'" *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002) (quoting *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000)). Then, after resolving ownership of the property and finding for the plaintiff, "the court proceeds to the second step, determining 'whether the governmental action at issue constituted a taking of that "stick."'" *Id.* (quoting *Karuk Tribe*, 209 F.3d at 1374).

In adjudicating the Katzins' takings claim, the Court of Federal Claims reviewed the history of Parcel 4 and the 10.01 acre peninsula located therein—from initial disposi-

tion by Spain through subdivisions and transfers, the creation of a maritime terrestrial zone and related easement, and the 1903 purchase by the United States of a 2.25 acre gun mount site. Again, "as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377 (Fed. Cir. 2008). Ownership is an essential predicate to a takings claim and requires decision.

The court today holds that the actions of the United States are not a taking, and declines to review the decision of the Court of Federal Claims concerning ownership of the 10.01 acre peninsula, stating that "because the Beasley fax was not a physical taking," it is unnecessary to address title. Maj. Op. at 21. However, the Beasley fax is the foundation of the takings issue. On the letterhead of the Fish & Wildlife Service Division of Realty, with the caption "Title of piece of land in Punta del Viento, Culebra, Puerto Rico," Mr. Beasley, on behalf of the Service, wrote to the contracted purchaser of the Katzins' property, with maps and documents "showing the lots and the maritime zone now owned by the F&WS." J.A. 3115, 3114–21.

The Beasley fax contained a "tracing of the 1887 map with F&WS parcel numbers added," and the 1982 Federal Register notices regarding land transfers. However, Mr. Beasley also stated that he "did not find the letter of transmittal" showing transfer of ownership to Fish & Wildlife. J.A 3115. Review of the language of the Beasley fax shows the uncertainty and partial information that the government injected into the Katzins' property and title.

My colleagues "encourage both parties to seek clarity over the property in question through settlement or other available avenues of resolution." Maj. Op. at 21. However, the existence of this lawsuit demonstrates the absence

of settlement or other avenues of resolution.   The judicial obligation is to "adjudicat[e] actual and concrete disputes, the resolutions of which have direct consequences on the parties involved." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013).

The resolution of dispute as to ownership is essential to determining whether there was a taking under the Fifth Amendment.   My colleagues disregard precedent by stating they "need not and do not address" the question of title. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (Marshall, C.J.) ("The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution.").

### *The Katzins' ownership comports with the evidence*

The Court of Federal Claims conducted a nine day trial in Puerto Rico and on the mainland, and determined the title and ownership of the tracts at issue.   The court found that, for the 10.01 acre peninsula on the eastern side of Parcel 4, the Katzins own this tract in fee simple "through a chain of title extending back to the late 1800s." CFC Op. at 476.   The court reviewed the recorded deeds, received expert testimony on Puerto Rican property law and procedure, heard the government's criticisms of various maps and surveys, and found that the "property registry contains no indication whatsoever that the government, or any other owner for that matter, separately acquired title to the peninsula such that it was segregated from the remainder of the property." *Id.* at 477.   The court found that the Katzins' "title to Parcel 4 includes title to the peninsula, subject to the maritime terrestrial zone and rescue easement that all parties concede are controlled by the government." *Id.* at 478.

The Court of Federal Claims also considered the issue concerning the 2.25-acre gun mount site purchased by the Navy in 1903, of which the unmarked location was a

subject of controversy at trial.[2]  On reviewing the 1903 deed and agreement of sale, the court found that the tract was located on "[f]ormer Lot 25 (now Parcel 5) [which] is located north of Parcel 4, placing the 2.25 acre tract well outside of the plaintiffs' current property."  CFC Op. at 478 (citation to record omitted).

The government argued that there was a discrepancy between the agreement of sale of the gun mount site, signed the day after the deed was executed, and the deed's description of the tract.  The government argued that the agreement of sale should control over the deed. The Court of Federal Claims reviewed all the documents including naval records relating to the gun mount, received expert testimony, and rejected the government's argument, based on: (1) the presumptions due a recorded deed under Puerto Rican real property law; (2) the "executory, *i.e.* taking effect at a future time" language of the agreement of sale; and (3) general inconsistency and insufficiency of the evidence regarding the agreement of sale.  *Id.* at 478–79.  Discussing the naval records, the court found that "[t]hese documents, however, are not proof of the tract's location," but rather, "[a]t most, these records demonstrate that Navy personnel, and later [Fish & Wildlife] personnel, *thought* the 2.25–acre tract was located on or near the peninsula."  *Id.* at 479.  The court concluded that because "no physical indicia exist" of the gun mount, "the government's claim to ownership of part of Parcel 4 as a site for a gun mount must fail."  *Id.*

I do not share my colleagues' view that adjudication of these foundational questions should be set aside, and the

---

[2]  The panel majority errs in stating that the "title to the gun mount site" is "the heart of this dispute."  Maj. Op. at 21.  Title to the gun mount site was resolved in 1903 by deed and contract.  Neither the Katzins nor the government challenged this title.

parties returned to their prior stand-off whereby the property ownership continues to be disputed and thus cannot be sold by the registered deeded owner.

### *Resolution of disputed title is predicate to a takings claim*

It is established that "in the case of a takings claim, the Court of Federal Claims has jurisdiction to determine the existence of property rights as a threshold inquiry in any takings case." *Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1379 (Fed. Cir. 2017). In *Bourgeois v. United States* the Court of Claims discussed the alternative availability of the Quiet Title Act, and wrote:

> This court is not denied jurisdiction now, simply because there is a quiet title issue involved in determining entitlement to just compensation *vel non*. As the Supreme Court stated in *Malone v. Bowdoin* [369 U.S. 643, 647 n.8 (1962)], the Court of Claims is an appropriate forum where plaintiff can try title by seeking just compensation for the taking of land by the United States.

545 F.2d 727, 729 n.1 (Ct. Cl. 1976).

When title is disputed as to property purportedly taken, and the remedy sought is just compensation, the Court of Federal Claims has authority to decide title. The government argues that allowing the Katzins to litigate title here is "an obvious end-run around the Quiet Title Act." Gov't Br. 46–47. Precedent is contrary. *See, e.g., Malone*, 369 U.S. at 647 n.8 ("Unlike the situation in [*United States v. Lee*, 106 U.S. 196 (1882)], there has been at all relevant times a tribunal where the respondents could seek just compensation for the taking of their land by the United States. That tribunal is the Court of Claims."); *Gila Gin Co. v. United States*, 231 Ct. Cl. 1001, 1002 (1982) ("[T]he jurisdiction of the district courts over quiet title actions under 28 U.S.C. § 2409a does not

preclude us from determining actions for just compensation even though the existence of a taking *vel non* depends upon whether the government had title to the property it allegedly took.").

The Supreme Court described the Court of Claims as a tribunal where sovereign immunity does not bar action against the United States. *Malone*, 369 U.S. at 647 n.8. In *Yaist v. United States*, 656 F.2d 616, 620 (Ct. Cl. 1981), where both the plaintiff and the government claimed title to a parcel of land in the Florida Everglades, the Court of Claims reiterated that "the plaintiff could appropriately try title in a just compensation suit, because the Quiet Title Act specifically excepted actions that could be brought under 28 U.S.C. § 1491." *Id.*; *see also Carlson v. United States*, 208 Ct. Cl. 1022, 1023 (1976) ("[T]he Supreme Court has recognized, albeit in a footnote, the Court of Claims as an appropriate tribunal where plaintiffs could try title by seeking just compensation for the taking of their land by the United States.").

The Court of Federal Claims, as the trial court successor to the Court of Claims, has been faithful to this responsibility. *See Dwen v. United States*, 62 Fed. Cl. 76, 81 (2004) ("It is now well-established that the court has jurisdiction to make independent factual determinations of a claimant's specific property interest as a matter of course in adjudicating takings claims.") (collecting cases).

The Katzins have not simply requested a declaration of their title as against the United States; their claim is for just compensation for the taking of their property by the United States. Precedent is clear that title may be determined as part of a just compensation claim. As stated in *Gila Gin Co.*:

> *Yaist* and *Bourgeois* unequivocally hold that if a suit involving a dispute over title seeks just compensation for the government's taking (as distinguished from return of the property), this court

has jurisdiction.  This is true even if the same suit could have been brought, and the same relief obtained, in the district court under the Quiet Title Act.

231 Ct. Cl. at 1003 (citation omitted).  And in *Petro-Hunt,* the Federal Circuit rejected the argument that "accrual of [the plaintiff's] permanent takings claim should have been suspended until resolution of the Quiet Title Action [in the district court]."  862 F.3d at 1379.  Precedent is unequivocal on this point.

The Court of Federal Claims fulfilled its responsibility in determining the Katzins' property rights.  It now falls upon the Federal Circuit to decide the appeal.  *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) ("Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" (quoting *Cohens v. Virginia*, 19 U.S. at 404)).

### *Clouding of title, blocking of conveyance, and destruction of economic value constitute a taking of property*

The Court of Federal Claims found that the 10.01 acre peninsula had been taken by the United States.  The panel majority now reverses that ruling, holds that the government's "claims of ownership" were "not a physical taking," and that there is no judicial redress although the government's actions to block sale have removed all economic value from the property.  Maj. Op. at 20–21.  It is not disputed that the Katzins have been unable to sell the property.  The Court of Federal Claims found that the "evidence of unsalability has not been contravened by the government," and that the "evidence in the record shows that after Mr. Beasley sent the facsimile of June 22, 2006, the plaintiffs lost a prospective buyer in Mr. Klaber, and have since been unable to sell the land."  CFC Op. at 482.  As the majority recognizes, "several potential buyers

refused to buy the property" in view of the government's ownership claim. Maj. Op. at 9.

The "right to convey hearkens back to the Statute of Quia Emptores in the year 1290, and the right to alienate one's property has been accepted as an incident of an estate in fee simple ever since." *Chianese v. Culley*, 397 F. Supp. 1344, 1345 (S.D. Fla. 1975). "[F]or what is the land but the profits thereof[?]" *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1017 (1992) (quoting 1 E. Coke, Institutes, ch. 1, § 1 (1st Am. ed. 1812)).

The purpose of this Fifth Amendment provision is to "secure *compensation* in the event of otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). "As its text makes plain, the Takings Clause 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power'"; that condition is the payment of just compensation. *Id.* at 536 (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314 (1987)). While precedent recognizes that incidental changes in general law can diminish land value without creating a taking, justiciable distinction arises "where the government has deprived a landowner of all economically beneficial uses." *Lucas*, 505 U.S. at 1018.

The panel majority writes that "[a]t most, the Beasley fax disseminated information about the government's claims, and the market incorporated that information into its valuation of the property." Maj. Op. at 18. Indeed so, for thereafter the Katzins have been unable to sell their property. CFC Op. at 481–82. The Court of Federal Claims found that the "evidence of unsalability has not been contravened by the government." CFC Op. at 482. My colleagues assign no error to that finding.

A case upon which my colleagues rely, *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1 (1984), stands

for the opposite proposition than that for which it is cited. The Court in *Kirby Forest* stated:

> We have frequently recognized that a radical cur-
> tailment of a landowner's freedom to make use of
> or ability to derive income from his land may give
> rise to a taking within the meaning of the Fifth
> Amendment, even if the Government has not
> physically intruded upon the premises or acquired
> a legal interest in the property.

*Id.* at 14. The Court expressly left open the question of "whether abrogation of an owner's right to sell real prop-erty, combined with a sufficiently substantial diminution of its utility to the owner, would give rise to a taking," *id.* at 15 n.25, while recognizing that where there is "an interference with an owner's legal right to dispose of his land" there can be a taking. *Id.* at 15.[3] The Court of Federal Claims found that the government wholly frus-

---

[3]    The majority proposes that *Kirby Forest* supports its position, Maj. Op. at 19 n.4. To the contrary. In *Kirby Forest* the entitlement to just compensation was undis-puted, and the major question was "the date on which the taking, in a 'straight-condemnation' proceeding, should be deemed to occur and the constitutional obligation of the United States to pay interest on the adjudicated value of the property." 467 U.S. at 9. Kirby Forest Industries had agreed with the United States that the timberland would become part of a national forest preserve and had volun-tarily ceased logging. *Id.* at 6. After price negotiations failed, price was decided in a condemnation proceeding. *Id.* at 7–8 (awarding "compensation in the amount of $2,331,202" and "interest at a rate of six percent"). The Court then resolved when interest started to accrue. The government did not dispute title, as it does here. *Kirby Forest* provides no support for the majority's ruling herein that no taking occurred.

trated the Katzins' ability to sell their property. CFC Op. at 482. My colleagues recognize as much. *See* Maj. Op. at 8–9 ("Mr. Beasley replied by faxing several documents . . . . On June 28, 2006, Ms. Motta communicated to Plaintiffs that Mr. Klaber would not buy Parcel 4. Thereafter, several potential buyers refused to buy the property.").

The Court of Federal Claims found that "[t]here is no indication from the record of trial that, absent court intervention, the government intends to renounce its claim of ownership to a part of plaintiffs' property, or that it has done so at the time of this writing." *Id.* at 481. This position is not softened by the government on appeal. The Court of Federal Claims correctly determined that the government's actions constitute a taking of the Katzins' real property, based on the government's assertion of ownership and the effect on alienation of the property. *Id.* Now before us on appeal, "a federal court's 'obligation' to hear and decide" cases within its jurisdiction "is 'virtually unflagging.'" *Sprint*, 571 U.S. at 77 (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). This obligation is not met by an optimistic hope of "settlement or other available avenues." Maj. Op. at 21.

CONCLUSION

I do not discern reversible error in the decision of the Court of Federal Claims, or any basis for declining to review that court's findings of title and ownership. From my colleagues' contrary rulings, I respectfully dissent.