# United States Court of Appeals for the Federal Circuit

_____

**CREATIVE MANAGEMENT SERVICES, LLC, DBA MC-2,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2020-1449

_____

Appeal from the United States Court of Federal Claims in No. 1:18-cv-01864-LKG, Judge Lydia Kay Griggsby.

_____

Decided:  February 26, 2021

_____

CHARLES A. WEISS, Bryan Cave Leighton Paisner LLP, St. Louis, MO, for plaintiff-appellant.  Also represented by STEPHEN R. SNODGRASS; ADAM L. SHAW, Washington, DC.

SONIA W. MURPHY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellee.  Also represented by DEBORAH ANN BYNUM, JEFFREY B. CLARK, ROBERT EDWARD KIRSCHMAN, JR.

_____

Before PROST, *Chief Judge*, LOURIE and STOLL, *Circuit Judges*.

STOLL, *Circuit Judge*.

Creative Management Services, LLC appeals the decision of the United States Court of Federal Claims dismissing its complaint as time-barred. Because the complaint was not timely filed within the twelve-month statute of limitations established by the Contract Disputes Act, 41 U.S.C. § 7104(b)(3), we affirm.

BACKGROUND

I

In July 2009, Creative Management Services, LLC, d/b/a MC-2 (MC-2) was awarded Government Services Administration (GSA) task order GSA-00-09-AA-0203 (the Task Order) to provide marketing and logistical support services for the annual GovEnergy Conference. The award was made based on MC-2's "no cost proposal to GSA," J.A. 68, under which the "[c]ost for [MC-2's] service w[ould] be 12% of all revenue generated from booth sales, sponsorship sales and registration sales by MC-2 for each conference," J.A. 65. The Task Order covers a base year from August 13, 2009, through August 31, 2010, with four one-year options. It further states that "Contractor performance for GovEnergy . . . shall be [in accordance with] the attached [Statement of Work] & at the prices based on estimated sales as stated herein." J.A. 64.

Relevant to this appeal, the Statement of Work requires that MC-2 "establish a separate bank account for all the revenue collected on behalf of the conference as a result of registration, exhibit sales and sponsorship sales." J.A. 75 § 2.4.2. It also specifies:

> For this conference, during the course of this contract, the Contractor shall collect monies from attendee and exhibitor registration fees. The

> Contractor shall collect and account for such monies and hold them in trust for GovEnergy. The Contractor shall maintain and provide to GovEnergy an accounting of all incoming monies in order to assure GovEnergy that all collected revenue has been accounted for.
>
> The monies collected shall comprise the "Reserve" for the conference event. **With the GSA [Contracting Officer's Technical Representative (COTR's)]** *written authorization* **upon review of a written monthly invoice, the COTR** *may* **direct the Contractor to pay itself for services provided, as well as the other monthly expenses, from the respective conference event "Reserve".**

J.A. 81 § 4.0. The Statement of Work further requires MC-2 to provide a "monthly expense-revenue report [that] shall include, [at] minimum, itemized expenditures, registration and tradeshow fees collected, and balance of the 'Reserve' prior to and after applying the invoice." J.A. 80 § 2.4.22.

MC-2 successfully performed the Task Order in 2009, 2010, and 2011, but GSA canceled the 2012 GovEnergy Conference before it began.

## II

On July 18, 2012, "[t]he Government request[ed] that MC-2 return the entire Reserve Fund . . . as well as an accounting of the amounts in the Reserve Fund over the life of the contract," indicating that based on the Government's "records[,] the amount of Reserve Fund is at least $1,230,127.05." J.A. 93. MC-2 purportedly responded by

letter[1] two days later.  The letter argued that GSA never before "claim[ed] that it was entitled to the difference between the [GovEnergy Conference] revenue and expenses," that MC-2, not GSA, was "entitled to any excess revenue," and that MC-2 had "submitted to the GSA a final accounting showing all revenue and expenses" at the end of each contracting year.  J.A. 103.[2]  In August 2012, MC-2 submitted to GSA a termination-for-convenience proposal and supporting documentation that outlined MC-2's termination costs.

In May 2013, GSA sent MC-2 a letter to "open[] negotiations on MC-2's proposed termination costs."  J.A. 94. GSA sent MC-2 another letter in January 2014, again requesting that MC-2 "provide an accounting of the monies held in the 'Reserve' account."  J.A. 98.  GSA characterized its letter as "a second demand to MC-2 that all monies remaining in the account be returned to GSA."  *Id.*  GSA also stated its "belief that the Reserve account under the control of MC-2 contained in excess of $1.3 million in 2012."  *Id.*

MC-2 responded in February 2015 that it had provided the requested information in July 2012 and that "MC-2 immediately refunded all monies raised by MC-2 for [the 2012 GovEnergy Conference] as was requested by GSA immediately following the cancelation."  J.A. 100.  After stating its belief that "any accounting related to previous years['] events that were successfully completed are not at issue now," MC-2 requested that GSA "consider immediate settlement of [MC-2's] cancellation proposal."  *Id.*

---

[1]    The July 20, 2012 letter is not signed or printed on letterhead.

[2]    In a July 11, 2012 email, MC-2 provided GSA an accounting summary indicating that the "[t]otal surplus at the end of the 2011 event is 1,288,429.05."  J.A. 92.

Four months later, the GSA contracting officer responded. He noted that, although MC-2's February 2015 response referenced and attached the July 2012 letter, that letter was not in the contract file. He also noted that, unlike previous MC-2 letters, the July 2012 letter was not on MC-2 letterhead and was not signed. Accordingly, the contracting officer requested that MC-2 provide a signed copy of the July 2012 letter and evidence that it was sent to GSA. Citing § 4.0 of the Statement of Work, GSA took the position that "the excess monies from one conference year [were] to be used for the following year's conference expenses." J.A. 104. GSA refused to accept MC-2's positions "that there are no remaining reserve funds, and in the alternative that MC[-]2 is entitled to such monies if they exist, without receiving the required final accounting." *Id.*

MC-2 responded in August 2015, maintaining its position that there was no Reserve Fund carried over from year to year, and that it was "not holding any money that belongs to the Government." J.A. 108.

### III

On November 10, 2015, GSA sent MC-2 a "letter provid[ing] the Contracting Officer's final decision" on MC-2's final termination settlement proposal, which had sought $717,680.10. J.A. 31. After recounting GSA's demand letters and evaluating MC-2's termination proposal, the contracting officer approved a settlement amount of $628,415.37 for MC-2. Nevertheless, the contracting officer denied MC-2's claim. The contracting officer reasoned that "[t]he termination proposal negotiations . . . resulted in a proposed settlement amount the Government believes is significantly less than the monies held by MC-2 in the Reserve Fund; thereby resulting in the likelihood of MC-2 owing the Government due to an offset." J.A. 39.

Discussing the background of MC-2's claim, the decision stated that "MC-2, prior to the cancellation of the Conference, had sent the Contracting Officer an email dated

July 11, 2012, stating that the surplus at the end of the 2011 GovEnergy Conference was nearly $1.3 million—*i.e.*, $1,288,429.05." J.A. 32. In providing reasons for the denial of MC-2's claim, the decision noted that "[t]he contract file contains information from MC-2 that reflects the existence of a Reserve Fund in the amount of approximately $1.2 million required to be held in trust on behalf of the Government." J.A. 40. Because "[r]epeated efforts by GSA personnel to receive a full and accurate accounting of the Reserve Fund from MC-2 were not forthcoming," the contracting officer stated that "GSA ha[d] relied on MC-2's information that there is over a $1.2 million surplus in the Reserve Fund controlled by MC-2" in reaching a final decision on MC-2's termination settlement proposal. J.A. 33.

Accordingly, the contracting officer determined that "MC-2 is actually indebted to the Government," J.A. 31, and restated the Government's "demand[] that MC-2 return all monies remaining in the account to GSA," J.A. 40. The decision further informed MC-2 that "GSA considers the Reserve Fund balance a contract debt in accordance with [Federal Acquisition Regulation (FAR)] 32.603."[3] *Id.*

In January 2018, GSA sent MC-2 a follow-up letter stating that GSA "hereby demands payment in the amount of $660,013.68 and applicable interest on this amount from July 18, 2012." J.A. 42. The letter characterized the November 2015 decision as "determin[ing] that MC-2 failed to account for, and improperly retained, $1,288,429.05 that was held in trust for the Government." *Id.* GSA pointed out that the November 2015 decision "determined that MC-2 was entitled to $628,415.37 resulting from the

---

[3]    FAR 32.603(a) provides: "If the contracting officer has any indication that a contractor owes money to the Government under a contract, the contracting officer shall determine promptly whether an actual debt is due and the amount."

termination for convenience" of the 2012 Task Order. *Id.* GSA arrived at the sum in its 2018 letter by taking the difference between the money MC-2 retained in the Reserve Fund and MC-2's termination-for-convenience entitlement. *Id.* Because MC-2 had "elect[ed] not to appeal the [2015] Final Decision," GSA deemed MC-2's debt to the Government "final and conclusive." *Id.* (citing 41 U.S.C. § 7103(g)).

IV

On December 6, 2018, MC-2 filed a complaint in the Court of Federal Claims seeking a declaratory judgment against the Government. Relevant to this appeal, MC-2 sought declarations that (1) "GSA did not provide a sum certain for its claim until, at the earliest, its letter of January 31, 2018," J.A. 25; and (2) "[t]he GSA letter of November 10, 2015, was not a final decision as to the Government's claim for a refund of the excess of revenue . . . because the letter failed to state a sum certain for the Government's claim," J.A. 27.

The Government moved to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims (RCFC), arguing that MC-2's declaratory judgment complaint was untimely because it was not brought within twelve months of the November 2015 decision. J.A. 50, 59; *see* 41 U.S.C. § 7104(b)(3) (providing that an action in federal court challenging a contracting officer's final decision must be filed within twelve months of receipt of the decision).

In agreeing with the Government that MC-2's declaratory judgment claims regarding the Reserve Fund were untimely, the Court of Federal Claims resolved three questions in the affirmative: (1) "whether the GSA issued a valid claim under the [Contract Disputes Act (CDA)] for the return of the Reserve Funds"; (2) "whether the GSA's CDA claim was the subject of a written decision by the GSA contracting officer"; and (3) "whether MC-2 failed to

commence this action within 12 months of receiving the GSA contracting officer's final decision on the government's CDA claim." *Creative Mgmt. Servs., LLC v. United States*, No. 18-1864C, 2020 WL 102992, at *6 (Fed. Cl. Jan. 8, 2020).

As to the first question, the court noted that the CDA does not define "claim." Therefore, the court applied the definition of "claim" set out in the FAR—"a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain." *Id.* (quoting 48 C.F.R. § 2.101). Applying this definition, the court concluded that "GSA issued a written demand to MC-2 for the return of the Reserve Funds on two separate occasions": (1) GSA's July 18, 2012 email "request[ing] that MC-2 return the entire Reserve Fund," amounting to "at least $1,230,127.05," *id.* (emphasis omitted) (quoting J.A. 93); and (2) GSA's January 2014 letter stating "a second demand to MC-2 that all monies remaining in the [Reserve] account be returned to GSA," *id.* (alteration in original) (quoting J.A. 98). Acknowledging that GSA's 2012 and 2014 communications "do not state the exact dollar amount," the court nonetheless reasoned that the communications demanded a "sum certain" because they "demand[ed] the return of '*the entire Reserve Fund*' and '*all monies*' contained in the Reserve Fund," which were "held in 'a separate bank account for all the revenue collected on behalf of the conference.'" *Id.* at *7 (first quoting J.A. 93; then quoting J.A. 98; and then quoting J.A. 75). In other words, GSA's demands stated a "sum certain" because "MC-2 could have readily calculated the precise amount of the funds contained in the Reserve Fund by obtaining the current balance for the Reserve Fund account." *Id.*

Regarding the second question, the Court of Federal Claims determined that the Government's CDA claim was the subject of the contracting officer's 2015 decision, because the contracting officer "addressed and analyzed the government's demand that MC-2 return the Reserve

Funds." *Id.* First, the decision noted "GSA's belief that MC-2 is actually indebted to the Government" by keeping and not accounting for money in excess of MC-2's certified claim. *Id.* (quoting J.A. 31). Second, the decision "refers to the pertinent contractual requirements of the MC-2 Task Order with regard[] to the Reserve Funds," namely, § 2.4.2. *Id.* (citing J.A. 32). Third, the decision referenced the contracting officer's 2012 and 2014 communications demanding return of the Reserve Funds. Finally, the contracting officer "den[ied] MC-2's claim for termination for convenience costs, because the proposed settlement amount *'is significantly less than the monies believed held by MC-2 in the Reserve Fund.'"* *Id.* at \*8 (quoting J.A. 39). The court rejected MC-2's assertion that the January 2018 letter from GSA represented the contracting officer's final decision on the Government's CDA claim.

Because the court concluded that the "contracting officer issued a final decision on the government's CDA claim demanding the return of the Reserve Funds on November 10, 2015," it held that "MC-2's Reserve Fund claims—which have been filed more than 12 months after MC-2 received the GSA contracting officer's final decision—are untimely." *Id.* (citing 41 U.S.C. § 7104(b)(3)).

MC-2 appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

MC-2's sole argument on appeal is that the Court of Federal Claims erred in concluding that the contracting officer's November 2015 decision was a final decision on a CDA claim by the Government against MC-2 because the decision did not state a "sum certain" as required by the CDA and the FAR. We find MC-2's argument unpersuasive.

I

The Government filed its motion to dismiss for failure to comply with the timing requirement of 41 U.S.C. § 7104(b)(3) as a motion for lack of subject-matter jurisdiction under RCFC 12(b)(1). Arguably, the Government should have brought its motion under RCFC 12(b)(6). Indeed, we have questioned whether compliance with the twelve-month filing period in § 7104(b)(3) is a jurisdictional requirement. *Guardian Angels Med. Serv. Dogs, Inc. v. United States*, 809 F.3d 1244, 1252 (Fed. Cir. 2016). For purposes of this case, however, we need not resolve the issue, as our consideration of the merits does not turn on whether we consider the Government's motion as one filed under RCFC 12(b)(1) as opposed to RCFC 12(b)(6). *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010) (declining to remand when "nothing in the analysis of the court[] below turned on the mistake, [and] a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion"). The Court of Federal Claims' dismissal of a complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1) and its dismissal of a complaint for failure to state a claim under RCFC 12(b)(6) are both reviewed de novo. *Walby v. United States*, 957 F.3d 1295, 1298 (Fed. Cir. 2020). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted).[4]

---

[4]    When deciding a RCFC 12(b)(1) motion that challenges the truth of jurisdictional facts alleged in the complaint, "the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018) (quoting *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir.

Under the CDA, the Court of Federal Claims may hear actions filed within twelve months of a contracting officer's final decision on a claim. 41 U.S.C. § 7104(b)(3). Jurisdiction in the Court of Federal Claims "requires both a valid claim and a contracting officer's final decision on that claim." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996)). The CDA also requires that "[e]ach claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer." 41 U.S.C. § 7103(a)(3). Because the CDA does not define a "claim," we look to the definition of "claim" in the FAR, at 48 C.F.R. § 2.101. *Maropakis*, 609 F.3d at 1327 (citing *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc)). Section 2.101 provides, in relevant part: "*Claim* means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract."

## II

As a threshold matter, we note that there is no requirement under the CDA that a final decision by a contracting officer state a "sum certain." Instead, a final decision by a contracting officer must address a CDA claim that itself must state a "sum certain." *See* 41 U.S.C. §§ 7103(a)(3), 7104(b)(3); 48 C.F.R. § 2.101; *Maropakis*, 609 F.3d at 1327. We construe MC-2's argument as an assertion that the November 2015 decision did not address any claim stating a "sum certain" as required under the CDA.

---

2014)). But this distinction does not apply here, as our analysis does not implicate any controverted facts.

We agree with the Court of Federal Claims that GSA's 2012 and 2014 communications each states a claim for a "sum certain," and that those communications were the subject of the contracting officer's November 2015 decision. We therefore conclude that the Court of Federal Claims did not err in determining that the contracting officer's November 2015 decision was a final decision on a CDA claim by the Government against MC-2, and that it did not err in dismissing MC-2's declaratory judgment complaint as untimely.

There is "no requirement in the [Contract] Disputes Act that a 'claim' must be submitted in any particular form or use any particular wording." *Cont. Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987). Rather, "[a]ll that is required is . . . a clear and unequivocal [written] statement that gives the contracting [party] adequate notice of the basis and amount of the claim." *Id.* (first citing *Tecom, Inc. v. United States*, 732 F.2d 935, 936–37 (Fed. Cir. 1984); and then citing *Metric Constr. Co. v. United States*, 1 Cl. Ct. 383, 392 (1983)). The requirement that a claim demand a "sum certain" serves to provide the parties with notice of the amount of the claim. *See Modeer v. United States*, 68 Fed. Cl. 131, 137 (2005) ("The sum certain requirement is met if the contracting officer can determine the amount claimed by a simple mathematical calculation." (citation omitted)), *aff'd*, 183 F. App'x 975, 977 (Fed. Cir. 2006); *see also* Appellant's Br. 14 (acknowledging that the purpose of the "sum certain" requirement is to make it "so that the contractor knows the amount of the claim").

Here, GSA's 2012 and 2014 communications provided MC-2 with notice of the amount of the Government's claim. Each of these communications met the "sum certain" requirement, making clear that the Government was demanding the return of all of the money in the Reserve Fund controlled by MC-2. J.A. 93 ("request[ing] that MC-2 return the entire Reserve Fund"); J.A. 98 (demanding that

"all monies remaining in the account be returned to GSA"). Indeed, MC-2 did not even need to perform a "simple mathematical calculation," *Modeer*, 68 Fed. Cl. at 137, to determine the amount of the Government's claim. As the account holder for the Reserve Fund, MC-2 only needed to check the Reserve Fund account balance to confirm the amount of the Government's claim.

That GSA's 2012 and 2014 communications do not demand an exact monetary sum is of no significance. The law does not require that a CDA claim identify a precise monetary amount to state a "sum certain." *See Modeer*, 183 F. App'x at 977 (affirming trial court's decision that a contractor's claim for rent for a holdover period stating a pro rata annual rent presented a "sum certain," even though the total number of months of holdover rent was not yet known when the claim was filed). Like the total rent due in *Modeer*, the amount of money in the Reserve Fund account was readily ascertainable to the party against whom the claim was made. Because MC-2 controlled the bank account containing the Reserve Fund, GSA's demand for all money in that account made it such that MC-2 knew or could easily ascertain the precise amount of the Government's claim.

Given that MC-2 had readily available all of the information necessary to determine the amount of the Government's claim, GSA's use of qualifying terms like "approximately" to refer to the Reserve Fund balance does not undermine the conclusion that GSA's 2012 and 2014 communications state a "sum certain." Contrary to MC-2's assertions, there is no rule that "[q]ualifying terms like 'nearly' or 'approximately,' . . . cannot be a sum certain." Appellant's Br. 18 (citing *J.P. Donovan Constr., Inc. v. Mabus*, 469 F. App'x 903, 907–08 (Fed. Cir. 2012)). Our conclusion that the claim in *Donovan* did not state a "sum certain" was premised not solely on the presence of qualifying language, but also on the fact that the claim "did not include supporting documents that would allow the

contracting officer to substantiate the claim." 469 F. App'x at 908. "In that form, [Donovan's] claimed amount was unascertainable." *Id.* That is not the case here.

Finally, GSA's articulation of differing Reserve Fund balance amounts at different times does not undermine the conclusion that GSA's 2012 and 2014 communications each states a claim for a "sum certain." The Reserve Fund balances expressed in these communications and the November 2015 decision uniformly refer to characterizations of the amount of money that GSA believed was in the Reserve Fund based on the information in its possession, not to a particular amount of money that the Government was demanding. *E.g.*, J.A. 32 (referring to MC-2's 2012 email, which "stat[ed] that the surplus at the end of the 2011 GovEnergy Conference was nearly $1.3 million"); J.A. 33 ("GSA has relied on MC-2's information that there is over a $1.2 million surplus in the Reserve Fund controlled by MC-2."); J.A. 40 (noting that "[t]he contract file contains information from MC-2 that reflects the existence of a Reserve Fund in the amount of approximately $1.2 million" and "demand[ing] that MC-2 return all monies remaining in the account"). In stating its beliefs regarding the Reserve Fund balance, GSA reasonably relied on information provided by MC-2, which, as the account holder, was in the best position to know the exact balance of the Reserve Fund. GSA's belief at any given time with respect to the amount of money in the Reserve Fund did not change the amount of money present in the Reserve Fund or make that amount uncertain or unknown to MC-2. The Government consistently claimed that MC-2 owed the Government the entire balance of the Reserve Fund, an amount readily ascertainable to MC-2 as the Reserve Fund account holder.

In sum, we agree with the Court of Federal Claims that GSA's 2012 and 2014 communications each states a claim for a "sum certain" under the CDA. We also agree that GSA's 2012 and 2014 CDA claims were the subject of the contracting officer's November 2015 decision. Because

MC-2 did not file its declaratory judgment action until December 2018, we conclude that MC-2's complaint was time-barred under 41 U.S.C. § 7104(b)(3), and that the Court of Federal Claims did not err in dismissing MC-2's complaint.

## CONCLUSION

We have considered MC-2's remaining arguments and do not find them persuasive. Accordingly, we affirm the decision of the Court of Federal Claims dismissing MC-2's declaratory judgment action as untimely.

## AFFIRMED