# United States Court of Appeals
# for the Federal Circuit

---

**CROW CREEK SIOUX TRIBE,**

*Plaintiff-Appellant*

**v.**

**UNITED STATES,**

*Defendant-Appellee*

---

2017-2340

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00760-RHH, Senior Judge Robert H. Hodges, Jr.

---

Decided: August 17, 2018

---

AUSTIN TIGHE, Nix, Patterson & Roach, LLP, Austin, TX, argued for plaintiff-appellant.

AMBER BETH BLAHA, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JEFFREY H. WOOD, ERIC GRANT, MATTHEW LITTLETON.

---

Before NEWMAN, DYK, and TARANTO, *Circuit Judges.*

DYK, *Circuit Judge.*

The Crow Creek Sioux Tribe ("Tribe") is a federally recognized Indian tribe. Its reservation is located in South Dakota along the Missouri River. The Tribe filed suit against the United States in the Court of Federal Claims ("Claims Court") seeking damages and declaratory and injunctive relief for the alleged taking of its water rights in violation of the Fifth Amendment, and for the alleged mismanagement of its water rights in violation of 25 U.S.C. § 162a(d)(8). The Claims Court dismissed the case for lack of subject-matter jurisdiction. We affirm, concluding that the Tribe has failed to establish, or even allege, that it has suffered the requisite injury in fact.

## BACKGROUND

The Crow Creek Indian Reservation ("Reservation") was established in central South Dakota in 1863. The Missouri River overlies the Reservation's western boundary. *See* Act of Mar. 2, 1889, ch. 405, § 6, 25 Stat. 888, 889–90 (1889) (delineating boundaries of the Reservation).

Under the Supreme Court's decision in *Winters v. United States*, 207 U.S. 564 (1908), the creation of an Indian Reservation carries an implied right to unappropriated water "to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976); *see also United States v. New Mexico*, 438 U.S. 696, 698–700 (1978). These reserved rights are known as *Winters* rights. They arise as an implied right from the treaty, federal statute, or executive order that set aside the reservation, and they vest on the date of the reservation's creation. *See Winters*, 207 U.S. at 576–77; *Arizona v. California*, 373 U.S. 546, 598 (1963) (rejecting the argument that water rights were not reserved because the reservation was created by executive order, rather than treaty). The parties agree for purposes

of the motion to dismiss that, pursuant to the *Winters* doctrine, the Tribe possesses a perfected right to sufficient water to fulfil the Reservation's purposes.

In June 2016, the Tribe filed suit in the Claims Court seeking at least $200 million in damages. The complaint began by describing various "Background Facts," including the establishment of the Reservation and the history of the Pick-Sloan Plan, a federal flood control project on the Missouri River, which involved the construction of the Fort Randall Dam and the Big Bend Dam in the mid-1900s.[1] The complaint also mentioned a 1996 statute that established a new trust fund for the Tribe, funded with up to $27.5 million in hydroelectric-power revenue from the Pick-Sloan Plan, *see* Crow Creek Sioux Tribe Infrastructure and Development Trust Fund Act of 1996, Pub. L. No. 104-223, § 2(a)(7), 110 Stat. 3026, 3027 (1996); highlighted a 2012 settlement between the Tribe and the United States unrelated to water rights; and emphasized the generally poor economic prospects of the Reservation.

---

[1] Construction of the dams resulted in the flooding of approximately 15,000 acres of the Reservation. To compensate the Tribe for this loss of land, Congress enacted two statutes by which the United States acquired the flooded land and paid the Tribe and its members more than $5 million total "in settlement of all claims, rights, and demands of" the Tribe "arising out of" dam construction. Act of Oct. 3, 1962, Pub. L. No. 87-735, § 1(a)(2), 76 Stat. 704, 704 (1962) (authorizing the acquisition of roughly 6,000 acres of Reservation land for the Big Bend project); Act of Sept. 2, 1958, Pub. L. No. 85-916, § 1, 72 Stat. 1766, 1766 (1958) (authorizing the acquisition of roughly 9,000 acres of Reservation land for the Fort Randall project).

The complaint then alleged that certain, unspecified acts and omissions by the United States—presumably including the continued operation of the dams—have taken the Tribe's "*Winters* reserved water rights" without just compensation in violation of the Fifth Amendment. J.A. 32. The complaint also alleged that the government breached its fiduciary duty to "[a]ppropriately manag[e] the natural resources located within the boundaries of Indian reservations," 25 U.S.C. § 162a(d)(8), "by the acts and omissions described hereinabove, including failing to protect, quantify, assert or record Plaintiff's water rights, and instead continuously diverting, retaining, and appropriating that water to others and to Defendant's own use," J.A. 31. The complaint did not allege that the government's actions deprived the Tribe of sufficient water to fulfill the reservation's purposes or that those actions would cause the Tribe to lack sufficient water in the future.

The United States filed a motion to dismiss pursuant to Rule 12(b)(1) of the Court of Federal Claims for lack of subject-matter jurisdiction. The Claims Court granted the motion, noting that *Winters* only entitles the Tribe to sufficient water to fulfill the Reservation's purposes and explaining that nothing in the complaint suggests that the Tribe is "experienc[ing] a shortage of water" or that its water supply from the Missouri River is or will be "insufficient for [the Tribe's] intended pursuits." *Crow Creek Sioux Tribe v. United States*, 132 Fed. Cl. 408, 410–11 (Fed. Cl. 2017). The Claims Court rejected the Tribe's argument that its Winters reserved water rights can be injured by any "taking or diverting [of] waters from the Missouri River," even if the diversion does not cause the Tribe to experience any water shortage. *Id.* at 410. The court also noted that, while 25 U.S.C. § 162a(d)(8) "does direct the government to manage the natural resources of Indian tribes," the statute "does not direct any specific

actions to be taken by the government in that management." *Id.* at 411. The Claims Court therefore dismissed the suit for lack of subject-matter jurisdiction because it could not "identify an injury to the Tribe that has yet occurred." *Id.* In various places in the opinion, the Claims Court discussed the failure of the complaint to allege damages with particularity. *Id.* at 409–11.

The tribe timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3). In assessing a motion to dismiss for lack of subject-matter jurisdiction, we "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018).

DISCUSSION

The Tribe initially argues that the Claims Court erred in dismissing its action because the Tribe could not calculate damages. We agree with the Tribe that there is no need to allege details of the damages calculation in the complaint. But the Claims Court's decision, while it sometimes uses the word "damages," turns on the Tribe's underlying failure to allege an injury in fact. Indeed, the Claims Court concludes its opinion by stating that "[t]he jurisdictional problem . . . arises from plaintiff's inability to identify an injury to the Tribe." *Crow Creek Sioux Tribe*, 132 Fed. Cl. at 411. We think the Claims Court was correct in dismissing the case for lack of subject-matter jurisdiction because the Tribe failed to sufficiently allege injury.

In order to bring suit in an Article III court, a plaintiff must establish constitutional standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The Court of Federal Claims, though an Article I court . . . applies the same standing requirements enforced by other federal courts

created under Article III." *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1358–59 (Fed. Cir. 2009) (quoting *Anderson v. United States,* 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)). To establish constitutional standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Standing requires more than just a "keen interest in the issue." *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013). It requires allegations that the plaintiff "personal[ly]" suffered a concrete and particularized injury in connection with the conduct about which he complains. *Spokeo*, 136 S. Ct. at 1548.

The Supreme Court has held that each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan*, 504 U.S. at 561. With this in mind, we join the majority of our sister circuits in holding that the Supreme Court's "plausibility" requirement for facial challenges to claims under Rule 12(b)(6), as set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), also applies to facial challenges to subject-matter jurisdiction under Rule 12(b)(1).[2] Thus, "[t]o survive a motion to dismiss [for lack

---

[2]    *See, e.g. Garling v. EPA*, 849 F.3d 1289, 1293 n.3 (10th Cir. 2017); *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016); *Silha v. ACT, Inc.*, 807 F.3d 169, 173–74 (7th Cir. 2015); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243–44 (3d Cir. 2012); *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam); *White v. United States*, 601 F.3d 545, 551–52 (6th Cir. 2010); *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007). We note that RCFC 12(b)(1) and

of standing], a complaint must contain sufficient factual matter" that would plausibly establish standing if accepted as true. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." *Id.*

The question here is whether the Tribe has sufficiently alleged injury in fact, which the Supreme Court has characterized as "a hard floor of Article III jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). The Tribe acknowledges that the *Winters* doctrine is the sole source of the legally protected interest asserted in this case—both for the takings claim and the statutory claim. Oral Arg. 00:30–00:50; J.A. 14. The question is whether the Tribe has sufficiently alleged injury to those rights.

The Tribe argues that various government actions and inactions with respect to the Missouri River, including the operation of the Pick-Sloan dams, constitute a taking of the Tribe's *Winters* water rights under the Fifth Amendment and a breach of the government's fiduciary duty under 25 U.S.C. § 162a(d)(8) to "appropriately manage[]" the Tribe's vested, *Winters* water rights, and thereby amount to an injury-in-fact. The Fifth Amendment's Takings Clause requires just compensation for the taking of property. Section 162a generally concerns the Secretary of the Interior's responsibility for management of Indian trust funds and expenditure of money collected from

_____

FRCP 12(b)(1) are substantially the same for these purposes.

irrigation projects, but it also states that "[t]he Secretary's proper discharge of the trust responsibilities of the United States shall include . . . [a]ppropriately managing the natural resources located within the boundaries of Indian reservations." 25 U.S.C. § 162a(d)(8). The Tribe's breach of trust claim is based on the view that its *Winters* water rights count as "natural resources" under § 162a(d)(8), and the government has a statutory duty to "appropriately manage" those *Winters* water rights.

While it is clear that the tribe possesses *Winters* rights, it is not clear whether those rights are protected by § 162a(d)(8). Because § 162a(d)(8) does not define "appropriate management" of natural resources and does not assign the Secretary any standards or specific obligations as to natural resources, the government argues that § 162a(d)(8) is not the kind of "specific rights-creating or duty-imposing statutory or regulatory prescription[]" required to support jurisdiction under the Indian Tucker Act. *United States v. Navajo Nation*, 537 U.S. 488, 506–07, 514 (2003) (holding that the Indian Mineral Leasing Act does not give the Secretary sufficient specific responsibilities to support Indian Tucker Act jurisdiction). But we need not decide that question. If § 162a(d)(8) does not cover *Winters* rights, the Tribe has suffered no injury under the statute. And even if *Winters* rights are "natural resources" for purposes of the statute, the Tribe still has not established standing.

The problem is that the complaint fails to allege that the government action has caused injury to the Tribe's *Winters* rights. As discussed above, the Supreme Court held in *Winters* that the establishment of an Indian reservation impliedly reserves the amount of water necessary to fulfill the purposes of the reservation. 207 U.S. at 576–77. *Winters* arose out of a dispute between Indians residing on the Fort Belknap Reservation and upstream, non-Indian water users who had constructed dams divert-

ing the water that otherwise would have flowed through the reservation. *Id.* at 565–67. The United States, in its capacity as trustee, sought to enjoin the diversions, but the upstream users claimed paramount water rights based on state water law that followed the prior-appropriation doctrine. *Id.* at 568–69. The *Winters* Court held that the Indians actually possessed the superior water right because the 1888 treaty establishing the Fort Belknap Reservation had also impliedly reserved water sufficient to fulfill the purposes of the reservation. *Id.* at 576–77. This implied water right was justified, in the Court's view, because Congress would have had no good reason to reserve land for Indians without also reserving their right to sufficient water for the reservation's purpose—which was, in that case, to encourage Indians to adopt an agricultural (and thus irrigation-dependent) way of life. *Id.* at 576.

The scope of *Winters* reserved water rights, like their existence, turns on the reservation's need for water. The amount of water reserved is "that amount of water necessary to fulfill the purpose of the reservation, no more." *Cappaert*, 426 U.S. at 141; *see also New Mexico*, 438 U.S. at 700 n.4; *Arizona*, 373 U.S. at 600–01. In *Winters* itself, the purpose of the reservation was agricultural in nature, 207 U.S. at 576, but other cases have noted fishing and hunting as a purpose of the reservation as well, *see United States v. Adair*, 723 F.2d 1394, 1410 (9th Cir. 1983) (identifying *Winters* rights as to "a quantity of the water flowing through the reservation not only for the purpose of supporting Klamath agriculture, but also for the purpose of maintaining the [Klamath] Tribe's treaty right to hunt and fish on reservation lands").

Thus, water is only reserved for the Tribe under *Winters* "to the extent needed to accomplish the purpose of the reservation." *Gila River Pima-Maricopa Indian Cmty. v. United States*, 695 F.2d 559, 561 (Fed. Cir. 1982); *see also*

*Cappaert*, 426 U.S. at 141. The facts alleged in the complaint, taken as true, suggest that government action, including operation of the Pick-Sloan dams, generally affects water flows on the Missouri River. But the complaint does not allege that the amount of water flowing by the Reservation and available for the Tribe's use is insufficient to fulfill the purposes of the Reservation or will be insufficient in the future. The Tribe therefore has failed to allege injury in fact, as necessary to demonstrate standing.

The Tribe argues that, because its *Winters* rights vested at the founding of the Reservation, any subsequent action affecting the waters of the Missouri River constitutes an injury of those rights, even if the action does not affect the Tribe's ability to draw sufficient water to fulfill the purposes of the Reservation. In the Tribe's view, "[w]hen the Government took and used the Tribe's water and water rights—whether the Tribe was using that water at the time or not, and despite the natural flow continuing along the river's banks—it breached its duty under 162a(d)(8) to appropriately manage the water, and alternatively, violated the Takings Clause by taking a fully vested property interest from the Tribe." Appellant Br. 34.

In so arguing, the Tribe appears to misunderstand what its water rights entail. As noted above, *Winters*, the sole source of the water rights asserted in this case, only entitles tribes to "that amount of water necessary to fulfill the purpose of the reservation, no more." *Cappaert*, 426 U.S. at 141. And because water rights are usufructuary in nature—meaning that the property right "consists not so much of the fluid itself as the advantage of its use"—the Tribe has no right to any particular molecules of water, either on the Reservation or up- or downstream, that may have been used or diverted by the government. *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1353

(Fed. Cir. 2013). The Tribe's *Winters* rights, which give the Tribe the right to use sufficient water to fulfill the purposes of the Reservation, simply cannot be injured by government action that does not affect the Tribe's ability to use sufficient water to fulfill the purposes of the Reservation. The complaint in this case does not allege that the challenged government action has such an effect.

## CONCLUSION

Because the Tribe failed to allege an injury in fact, we affirm the Claims Court's dismissal for lack of subject-matter jurisdiction.

## **AFFIRMED**

### COSTS

No costs.