# United States Court of Appeals for the Federal Circuit

---

**CHEMEHUEVI INDIAN TRIBE,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-1366

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00492-MHS, Judge Matthew H. Solomson.

---

Decided:  June 18, 2024

---

MARIO GONZALEZ, Gonzalez Law Office, Prof. LLC, Rapid City, SD, argued for plaintiff-appellant.

TAMARA N. ROUNTREE, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by TODD KIM.

---

Before MOORE, *Chief Judge*, HUGHES and CUNNINGHAM, *Circuit Judges*.

HUGHES, *Circuit Judge.*

The Chemehuevi Indian Tribe appeals the United States Court of Federal Claims' dismissal of each Count of its second amended complaint. For the reasons that follow, we affirm the trial court's dismissal of all Counts for lack of subject-matter jurisdiction but vacate the trial court's dismissal of Count III for failure to state a claim.

I

The Tribe filed its first complaint against the United States on April 20, 2016, which the Government moved to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims (RCFC) for lack of subject-matter jurisdiction. The trial court denied the Government's motion, instead permitting limited jurisdictional discovery and ordering the Tribe to file an amended complaint with more specific claims. The Tribe thereafter filed its first amended complaint in 2017, and jurisdictional discovery ensued.

On April 15, 2019, the Tribe filed its second amended complaint (hereinafter, complaint), which is operative, articulating five Counts and seeking money damages against the United States under the Tucker Act (codified at 28 U.S.C. § 1491) and the Indian Tucker Act (codified at 28 U.S.C. § 1505). J.A. 198 (Compl. ¶ 5). The Tribe invokes the "investment statutes" of 25 U.S.C. §§ 161, 161a, 162(a), 4011, and 4044 as giving rise to its money-mandating Tucker Act claims. J.A. 199 (Compl. ¶ 6).

Once more, the Government moved to dismiss the Tribe's complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1) (Counts I–V) and for failure to state a claim upon which relief can be granted under RCFC 12(b)(6) (Counts II–IV). The trial court granted these motions. *Chemehuevi Indian Tribe v. United States*, 150 Fed. Cl. 181, 220 (2020) (*Decision*).

The Tribe's uncontested factual allegations for each Count are recited below.

## A

Count I of the Tribe's complaint relates to funds the Tribe was awarded for a taking of its land on which the Parker Dam and its reservoir, Lake Havasu, reside. The Chemehuevi Indian Tribe has long "used and occupied the Mojave Desert's mountains and canyons and the Colorado River shoreline." J.A. 199 (Compl. ¶ 7). In 1907, the Secretary of the Interior established the Chemehuevi Indian Reservation, setting aside 36,000 acres for the Tribe. J.A. 200 (Compl. ¶ 11). Much of this land "consisted of high mesa desert that was not suitable for farming, cattle grazing, or any other form of development." J.A. 200 (Compl. ¶ 12). A "far smaller" portion of the Chemehuevi Reservation included "a steep valley leading down to the Colorado River," the base of which was "suitable for both agriculture and human habitation." J.A. 200 (Compl. ¶ 12).

In the 1930s, "the Department of the Interior's Bureau of Reclamation contracted with [the Metropolitan Water District of Southern California or] MWD for the cooperative construction and operation" of a dam "to provide a reservoir of clear water from which the MWD could pump a maximum supply of 1,500 cubic feet per second (cfs) of Colorado River water." J.A. 201 (Compl. ¶ 14). The resulting Parker Dam and its associated reservoir, Lake Havasu, would be located along the Colorado River and at least partially built on Chemehuevi tribal lands. J.A. 200–02 (Compl. ¶¶ 13, 16). Lake Havasu was expected to flood portions of Chemehuevi tribal lands. J.A. 203 (Compl. ¶ 21).

In 1939, the Solicitor of the Department of the Interior concluded that the MWD must compensate the Tribe for the "damages to certain lands . . . which will be flooded by the Parker Dam." J.A. 203 (Compl. ¶ 21). The following year, Congress passed a law authorizing the taking "in aid of the construction of the Parker Dam project" and directed

the Secretary to "determine the amount of money to be paid to the [Tribe] as just and equitable compensation" for those lands. Act of July 8, 1940, ch. 552, §§ 1–2, 54 Stat. 744; *see also* J.A. 203–04 (Compl. ¶ 23). That same Act provided that MWD would deposit the funds with the Secretary of the Interior pursuant to the Act of May 17, 1926 (44 Stat. 560). Act of July 8, 1940, ch. 552, § 2; *see also* J.A. 203–04 (Compl. ¶ 23).

In 1940, the Tribe was awarded $108,104.95 (the Parker Dam compensation funds) for the 7,776.14 acres of reservation land taken. J.A. 205–08 (Compl. ¶¶ 26–27, 30). "[F]ollowing the taking, the remaining area of the Chemehuevi Reservation consisted of 28,223.87 acres of mesa land or hillside desert land worth no more than about $2.00 per acre." J.A. 206 (Compl. ¶ 28) (cleaned up and citation omitted).

The Government placed a portion of the Parker Dam compensation funds "in a Treasury Account from 1940 until at least June 5, 1970." J.A. 207–08 (Compl. ¶¶ 30, 32). The Tribe received a memorandum dated June 16, 1959 "from the Research and Reporting Section to the Chief, Branch of Tribal Programs of the [Bureau of Indian Affairs]" stating that $85,193.11 was in an account (Account Number 14X7344) and that $55,166.87 of accrued interest was in a separate account (Account Number 14X7844). J.A. 208–10 (Compl. ¶ 33). Years later, another memorandum dated June 9, 1970 showed that Account Number 14X7344 contained $127,393.98 and that Account Number 14X7844 contained $89,062.70. J.A. 211 (Compl. ¶ 36). As of the date of the Tribe's filing of its operative complaint, the Tribe is unsure if it ever received any portion of the Parker Dam compensation funds. J.A. 211 (Compl. ¶ 37).

In Count I of its complaint, the Tribe contends that no complete accounting of the Parker Dam compensation monies has been received from 1940 until the date of filing of their second amended complaint. J.A. 228–29 (Compl.

¶¶ 84, 86). The Tribe is suing for breach of trust[1] and seeks an accounting and damages for the Government's alleged mismanagement of Parker Dam compensation funds from 1940 to now. J.A. 229–31 (Compl. ¶¶ 87–91).

B

In Count II, the Tribe brings an unrelated land-based claim that stems from two petitions filed with the Indian Claims Commission (ICC) in the early 1950s. J.A. 211–12 (Compl. ¶¶ 38–40); *see also* J.A. 231 (Compl. ¶ 93). One petition "was withdrawn and dismissed by the ICC by mutual agreement of the Chemehuevi parties." J.A. 212 (Compl. ¶ 42). The other petition was split into two claims: "Docket No. 351, . . . a claim for a taking of Chemehuevi aboriginal title land in the present states of California, Arizona and Nevada" and "Docket No. 351-A, . . . a claim for the accounting and other relief." J.A. 212 (Compl. ¶ 41). The claims were later settled, with the Tribe receiving a judgment for $996,834.81 (the ICC Judgment funds). J.A. 213–14 (Compl. ¶¶ 45, 47).

In 1965, Congress appropriated funds to pay the ICC judgment (*see, e.g.*, J.A. 214 (Compl. ¶ 48)) and five years later, Congress passed a law providing that the funds be "distributed by the Secretary of the Interior . . . in equal shares" to eligible persons. Act of September 25, 1970, Pub.

---

[1] In its complaint, the Tribe alleges the Government has breached its fiduciary duties. *See, e.g.*, J.A. 229–30 (Compl. ¶ 88). In its briefing on appeal, the Tribe refers to its "breach-of-trust claims." *See, e.g.*, Appellant's Br. 3. For consistency with the claims as identified before the trial court, we refer to the Tribe's claims as breach-of-trust claims. *See Chemehuevi Indian Tribe v. United States*, No. 16-492 (Fed. Cl. April 1, 2020), ECF No. 79 Ex. A (claim table jointly submitted to the trial court summarizing Tribe's causes of action alleged in complaint).

L. No. 91-417, 84 Stat. 868. The ICC then awarded the Tribe attorneys fees and expenses. J.A. 214 (Compl. ¶ 49). "The ICC judgment award constitutes 'trust funds' under 31 U.S.C. § 1321(67)." J.A. 214 (Compl. ¶ 49). The Tribe notes that the Government is the trustee of any unclaimed per capita payments. *See* J.A. 214–15 (Compl. ¶ 51).

In Count II of its complaint, the Tribe similarly alleges that no complete accounting has been provided to the Tribe "from June 1965 until at least September 1970, and/or the ultimate disbursement or disposition of the ICC Judgment Funds." J.A. 231 (Compl. ¶ 94). The Tribe is suing for breach of trust and seeks an accounting and damages for the ICC Judgment funds for Dockets 351 and 351-A. J.A. 231 (Compl. ¶¶ 92–97).

## C

Count III relates to the Tribe's water rights. The Chemehuevi Reservation exists on "the California side of the Colorado River with the Colorado River as the eastern boundary." J.A. 200 (Compl. ¶ 11). The Tribe has vested *Winters* water rights in the Colorado River. *See Arizona v. California*, 373 U.S. 546, 600 (1963) (*Arizona I*) (explaining that in *Winters v. United States*, 207 U.S. 564 (1908), the Supreme Court held that by creating a reservation, Congress impliedly reserved "waters without which their lands would have been useless"); *see also* J.A. 233–34 (Compl. ¶¶ 99–101). The Chemehuevi Tribe has the right to use Colorado River water "in annual quantities not to exceed (i) 11,340 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 1,900 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less, with a priority date of February 2, 1907." *Arizona v. California*, 376 U.S. 340, 344 (1964).

The Tribe "has used or consumed on the Chemehuevi Reservation only a small portion of the Tribe's annual allocation of water from the Colorado River." J.A. 236 (Compl.

¶ 107); *see also* J.A. 238 (Compl. ¶ 110). As explained by the Government, "[a]ny amount of the annual water allocation that Chemehuevi does not divert remains in the Colorado River water [s]ystem . . . ." Appellee's Br. 31 n.10. Historically, junior users have been permitted by the Department of the Interior to use the undiverted water in the Colorado River. *See* J.A. 236–37 (Compl. ¶ 108); J.A. 238 (Compl. ¶ 110); *see also* Appellee's Br. 31 n.10.[2]

In the late 1990s, the Tribe "proposed [a] 25-year lease of 5,000 acre feet per year of its quantified water rights." J.A. 237–38 (Compl. ¶ 109). By leasing its water rights, the Tribe hoped "to reduce poverty and provide funds for economic development in the areas of education, employment, health and agriculture." J.A. 238 (Compl. ¶ 109). The Tribe's proposed lease was never approved or denied. *See* J.A. 238–39 (Compl. ¶ 112).

In Count III of its complaint, the Tribe asserts that the Government's failure to approve the Tribe's proposed long-term lease, and allowance of junior users to use the "Chemehuevi Tribe's 'surplus' quantified water rights" without payment, constituted a Fifth Amendment taking

---

[2]    The parties dispute whether this undiverted water is "excess water" (*see* Appellee's Br. 28 n.8) or "surplus water" (*see* Reply Br. 12 n.5). In *Arizona v. California*, 547 U.S. 150, 155 (2006), the Supreme Court described additional water available above what was necessary "to satisfy annual consumptive use" as "surplus." On the other hand, there is authority that stream waters "which are over and above those used to satisfy *Winters* rights" are "excess" waters. *Holly v. Confederated Tribes & Bands of Yakima Indian Nation*, 655 F. Supp. 557, 558 (E.D. Wash. 1985) (citing *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 47 (9th Cir. 1981)). To resolve this case, we need not decide whether the water allocated to junior users is "excess" or "surplus."

and a breach of fiduciary duty to ensure the trust property was productive, and the Tribe seeks an audit and accounting as well as compensation and damages. J.A. 239–45 (Compl. ¶¶ 113–18, 122–23).[3]

### D

Count IV is related to Count I. After constructing the Parker Dam, twenty-one miles of the land taken in connection with the project became shoreline property on Lake Havasu. J.A. 245–46 (Compl. ¶ 125).

In 1974, long after the Parker Dam was constructed, the then-Secretary of the Interior "correct[ed] the designation by [former] Secretary Ickes of November 25, 1941, that certain lands of the Chemehuevi Indian Reservation should be taken for use in the construction of Parker Dam pursuant to the Act of July 8, 1940, 54 Stat. 744." J.A. 313 (Secretarial Order of November 1, 1974); J.A. 245–46 (Compl. ¶¶ 125–26). At that time, the Tribe was awarded "full equitable title to all those lands within the Chemehuevi Indian Reservation designated to be taken by Secretary Ickes in 1941 between the operating pool level of Lake Havasu on the east (elevation 450 feet m.s.l. [mean sea level])" with specified north and south boundaries. J.A. 313; J.A. 245–46 (Compl. ¶¶ 125–26). Therefore, the Tribe regained title to the twenty-one miles of shoreline land on Lake Havasu.

Since the 1974 correction, the Tribe has received annual income in the form of "(1) income from rents and leases and (2) income in the form of audited net profit distributions from the Havasu Landing Resort." J.A. 247–48 (Compl. ¶ 131). Some payments from rents and leases "are made directly to the Chemehuevi Tribe, and the remainder

---

[3] The Tribe also pleaded disparate treatment, J.A. 243–44 (Compl. ¶¶ 119–21), but this claim is not raised on appeal.

are made to the [Bureau of Indian Affairs or] BIA for deposit to the Tribe's BIA 'suspense accounts,' sometimes referred to as 'special deposit accounts.'" J.A. 248 (Compl. ¶ 133). By contrast, "income distributions from the Resort have been distributed directly from the Resort to the Chemehuevi Tribal Government." J.A. 248 (Compl. ¶ 132).

In Count IV of its complaint, the Tribe alleges that the Government unconstitutionally took the twenty-one miles of shoreline land and breached its fiduciary duties regarding this land while the Government possessed it, and the Tribe seeks an accounting and damages. J.A. 245–47 (Compl. ¶¶ 128–30). In addition, the Tribe alleges that the Government is liable for breach of trust regarding its management of the suspense accounts, which the Tribe contends have never been audited. J.A. 249 (Compl. ¶¶ 136–37).

E

Count V deals with the sufficiency of the Tribe's Arthur Andersen report. In 1987, Congress directed the federal government to "audit[] and reconcile[]" the tribal funds held in trust and provide an accounting of those funds for all Tribes. Act of Dec. 22, 1987, Pub. L. No. 100-202, 101 Stat. 1329, 1329-229. This directive was subsequently reaffirmed. Act of Oct. 23, 1989, Pub. L. No. 101-121, 103 Stat. 701, 714; Act of Nov. 5, 1990, Pub. L. No. 101-512, 104 Stat. 1915, 1929–30; Act of Nov. 13, 1991, Pub. L. No. 102-154, 105 Stat. 990, 1004. In 1994, Congress required the Secretary of the Interior to provide, "by May 31, 1996, a report identifying for each tribal trust fund account for which the Secretary is responsible a balance reconciled as of September 30, 1995." 25 U.S.C. § 4044. In 2000,[4] the

---

[4]    The parties differ in their representations regarding when the Tribe received the Arthur Andersen report.

Tribe received a report from Arthur Andersen LLP (the Arthur Andersen report), which purported to audit and reconcile the Tribe's trust accounts from 1972 to 1992. *See* J.A. 211 (Compl. ¶ 37).

In Count V of its complaint, the Tribe alleges that the Government has never provided an accounting sufficient to allow the Tribe to "determine the full extent of its losses as a result of the Federal Government's breaches of its fiduciary duties" and seeks a declaration that the Arthur Andersen report did not comply with the 1987 Act. J.A. 250–51 (Compl. ¶¶ 143, 145). The Tribe also seeks "a full and complete accounting of the Tribe's tribal accounts that meets the requirements of the Act of December 22, 1987, Pub. L. 100-202, 101 Stat. 1329 and of the subsequent federal statutes reaffirming those requirements." J.A. 251 (Compl. ¶ 145). The Tribe also requests damages for any

---

The Tribe refers to the report as the "1992 Arthur Andersen Report" throughout its complaint. *See, e.g.*, J.A. 249 ("1992 Arthur Andersen Report Failed to Meet The Government's Statutory Obligation to Provide The Chemehuevi Tribe With An Accounting Of The Tribe's Trust Funds."). In its reply brief, the Tribe refers to the same report as the 1996 Andersen Report. *See, e.g.*, Reply Br. 8. The trial court refers to the same report as the 1996 Arthur Andersen Report because it was received by the Tribe in 1996. *Decision* at 189, 210–11.

As the trial court noted (*Decision* at 211), by statute, the Arthur Andersen report was deemed received by the Tribe on December 31, 2000. Settlement of Tribal Claims – Amendment, Pub. L. No. 109-158, § 1, 119 Stat. 2954 (Dec. 30, 2005). For purposes of our analysis, it does not matter whether the Arthur Andersen report was received in 1996 or 2000, but we consider the report received on December 31, 2000.

"additional monetary claims against the United States" to which it is entitled. J.A. 251 (Compl. ¶¶ 144–45).

## II

In a thorough decision rendered after more than two years of jurisdictional discovery, the trial court granted the Government's motion to dismiss all Counts under RCFC 12(b)(1) and alternatively, Counts II–IV under RCFC 12(b)(6). *Decision* at 220. Noting that the Government's motion "challenge[d] the factual basis for the [trial court's] subject-matter jurisdiction (*i.e.*, regarding the statute of limitations)," the trial court recognized that the Tribe's allegations in the complaint were not controlling, assumed only uncontroverted factual allegations were true, and resolved controverted jurisdictional factual allegations. *Decision* at 187 n.5 (citing *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993)).

The trial court dismissed the Tribe's accounting claims for lack of jurisdiction because the Tribe sought the accounting to determine whether it "has any claim at all" against the United States. *Decision* at 203–05. The trial court also dismissed Counts I–V for lack of jurisdiction because, assuming the Tribe's claims had accrued, they accrued more than six years prior to the Tribe's filing of its initial complaint in April 2016 and were therefore barred by the statute of limitations. *Decision* at 201–02, 205–06. Finally, the trial court alternatively dismissed Counts II, III, and IV for failure to state a claim upon which relief can be granted. *Decision* at 215–20.

The Tribe timely appealed. We have jurisdiction over the trial court's final decision under 28 U.S.C. § 1295(a)(3).

## III

Whether the Court of Federal Claims properly dismissed a plaintiff's complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1) is a question of law reviewed de novo on appeal. *Folden v. United States*, 379

F.3d 1344, 1354 (Fed. Cir. 2004). Where a RCFC 12(b)(1) motion "challenges the truth of jurisdictional facts alleged in the complaint, 'the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff.'" *Creative Mgmt. Servs., LLC v. United States*, 989 F.3d 955, 961 n.4 (Fed. Cir. 2021) (quoting *Stevens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018)). Where a RCFC 12(b)(1) motion "simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations—that is, the movant presents a 'facial' attack on the pleading—then those allegations are taken as true and construed in a light most favorable to the complainant." *Cedars-Sinai Med. Ctr.*, 11 F.3d at 1583. To the extent our analysis does not rely on any controverted facts, this distinction is immaterial. *See Creative Mgmt. Servs.*, 989 F.3d at 961 n.4.

Under the Tucker Act, if the Court of Federal Claims has jurisdiction to render a judgment, it also has the authority to award "an entire remedy" that is "an incident of and collateral to" its judgment. 28 U.S.C. § 1491(a)(2). "For jurisdiction to lie under the Tucker Act, 'the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum.'" *Doe v. United States*, 100 F.3d 1576, 1579 (Fed. Cir. 1996) (quoting *Eastport Steamship Corp. v. United States*, 178 Ct. Cl. 599, 605 (1967)). In this vein, where a plaintiff can show they are entitled to money damages, the Court of Federal Claims "in the exercise of its jurisdiction may order the Government, if needed, to render an accounting . . . ." *Doe*, 100 F.3d at 1584; *see also Confidential Informant 59-05071 v. United States*, 134 Fed. Cl. 698, 720 (2017) ("The Court [of Federal Claims] has power to require an accounting in connection with its jurisdiction over a money claim under the Tucker Act."), *aff'd*, 745 F.

App'x 166 (Fed. Cir. 2018) (nonprecedential Rule 36 affirmance).

The Court of Federal Claims lacks the authority to order an accounting, which is equitable relief, unless the plaintiff has established it is entitled to money damages. *See, e.g.*, *Klamath & Modoc Tribes & Yahooskin Band of Snake Indians v. United States*, 174 Ct. Cl. 483, 487–88 (1966). Instead, plaintiffs must go to a court of equity, such as a district court, to obtain the desired equitable relief.

The Court of Federal Claims does not have jurisdiction "unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. "The 6-year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988).

Whether a claim brought under the Tucker Act (28 U.S.C. § 1491) is barred by the statute of limitations is a question of law that may be based on underlying fact findings. *Katzin v. United States*, 908 F.3d 1350, 1358 (Fed. Cir. 2018). We review the Court of Federal Claims' factual findings for clear error. *Id.*

IV

Construing all facts in the light most favorable to the Tribe, we conclude that the trial court correctly dismissed Counts I, II, IV, and V of its complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1) because fundamentally the Tribe seeks an accounting to discover what claims it has against the Government but has not established any entitlement to money damages. The Court of Federal Claims does not have authority to order such an accounting, and we therefore affirm its dismissal for lack of subject-matter jurisdiction.

A

The Tribe's complaint is devoid of any specific allegations of mishandling regarding the Parker Dam compensation funds, ICC Judgment funds, and suspense accounts, likely because it has not received an accounting that would allow the Tribe to discover any wrongdoing. Instead, as explained below, in Counts I, II, IV, and V of its complaint, the Tribe seeks an accounting to discover what claims it may have.

1

In Count I, the Tribe seeks "an accounting and damages for mismanagement of Parker Dam Compensation monies" between 1940 and 1970 and between 1970 to 2019. *See* J.A. 226 (Compl. ¶ 75). But in Count I, the Tribe notes that the Government "has produced no documentation in its response to the Tribe's jurisdictional discovery requests that an accounting was ever made for the Parker Dam Compensation funds between 1940 and 1970, or that the Federal Government ever repudiated its trust responsibility regarding such funds." J.A. 228–29 (Compl. ¶ 84). The Tribe similarly recites its claims for damages from 1970–2019. *See, e.g.*, J.A. 229 (Compl. ¶ 86) ("The Federal Government has never provided the Tribe with a complete accounting of the Parker Dam Compensation monies from 1970 up to the time this Second Amended Complaint was filed."). The Tribe is unable to pinpoint any examples of mismanagement.

After noting the Government's failure to provide the Tribe with an accounting or any documentation regarding its handling of the Parker Dam compensation funds (J.A. 228–29 (Compl. ¶¶ 83–86)), the Tribe nevertheless alleges that the Government "breached its fiduciary duties" with regards to the Parker Dam compensation funds (J.A. 229–30 (Compl. ¶ 88–89)). But the Tribe does not provide any facts supporting its claims for breach of trust and instead seeks "damages for *any and all* mismanagement by

the Federal Government of the Parker Dam Compensation Monies occurring on or after 1946, *including any and all such mismanagement disclosed by any accounting* ordered by the Court . . . ." J.A. 230–31 (Compl. ¶ 91) (emphasis added); *see also* J.A. 230 (Compl. ¶ 90).

Even in the Tribe's briefing before this court, it contends that the statute of limitations on Count I's request for an accounting is "tolled until the Government ma[kes] a complete and meaningful accounting of the Tribe's trust funds and openly repudiate[s] the trust." Appellant's Br. 1; *see also, e.g.*, Appellant's Br. 22. Considering the facts in the light most favorable to the Tribe, and excluding from consideration the Tribe's legal conclusions (*see, e.g.*, *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (explaining "we are not bound to accept as true a legal conclusion" in reviewing a motion to dismiss)), the Tribe seeks an accounting and to recover from any improprieties exposed by that accounting.

2

Turning to Count II, the Tribe's allegations are similar. The Tribe asserts that the Government breached its fiduciary duties by failing to provide an accounting of the ICC Judgment funds or otherwise mismanaging the funds. J.A. 231–32 (Compl. ¶¶ 94–95). Once more, the Tribe argues it "is entitled to a full accounting from the Government of the retention and ultimate disbursement or disposition of the ICC Judgment Funds," and seeks to "recover damages for *any and all* mismanagement by the Federal Government of the ICC Judgment Funds, including *any and all such mismanagement disclosed by an accounting* . . . ." J.A. 232–33 (Compl. ¶¶ 96–97) (emphasis added).

Here too, the Tribe is unable to point to any evidence of mismanagement, instead reiterating its request for an accounting. *See, e.g.*, Appellant's Br. 6–7 ("No accounting has ever been made by the Government . . . ."); Appellant's Br. 14 (arguing its claim is timely based on tolling of the statute of limitations on Count II until "the Government

made a complete and meaningful accounting of these trust funds"). Taking the uncontested facts in the light most favorable to the Tribe, the Tribe is asking the court for an accounting.

3

The Tribe, in Count IV,[5] requests an accounting of, and any associated damages for, mismanagement of the suspense accounts. J.A. 248–49 (Compl. ¶¶ 135–37). In its appellate briefing, the Tribe notes, as it does for the other Counts, that "[n]o accounting has ever been rendered to the Tribe regarding [the] fees, charges, rents, and other monies." Appellant's Br. 51. But as is the case with the other Counts, taking the facts in the light most favorable to the Tribe, the Tribe seeks an accounting.

4

Finally, in Count V,[6] the Tribe contends that "[t]he deficiencies and gaps endemic to the Federal Government's

---

[5]   The Tribe also alleges that the Government committed a Fifth Amendment taking of the twenty-one miles of Lake Havasu shoreline between 1941 and 1974 and breached its fiduciary duties regarding that land, seeking an audit and an accounting. J.A. 246–47 (Compl. ¶¶ 127–30). Viewing the facts in the light most favorable to the Tribe, the trial court correctly dismissed this portion of Count IV for lack of subject-matter jurisdiction under the Tucker Act's six-year statute of limitations because any claim the Tribe may have had based on this alleged taking, *see Hopland Band of Pomo Indians*, 855 F.2d at 1577, accrued long before April 20, 2010.

[6]   In Count V, the Tribe also seeks "a declaration that the 1992 Arthur Andersen Report does not meet the Federal Government's obligations under the Act of December 22, 1987, Pub. L. 100-202, 101 Stat. 1329 and of the

accounting system severely limited the Chemehuevi Tribe's ability to determine the full extent of its losses . . . ." J.A. 250–51 (Compl. ¶ 143). The Tribe notes that the Government "has failed up to the filing date of this Second Amended Complaint to render any bonafide reconciliation and accounting of the Chemehuevi Tribe's trust funds and assets . . . ." J.A. 251 (Compl. ¶ 144). The Tribe requests "a full and complete accounting of the Tribe's tribal accounts" and damages on any claims that are "*reveal[ed]*" as the result of an accounting. J.A. 251 (Compl. ¶¶ 144–45) (emphasis added).

On appeal, the Tribe invokes the Court of Federal Claims' authority to award an accounting "in aid of its jurisdiction to render a money judgment" on a claim. Appellant's Br. 54 (quoting *Klamath*, 174 Ct. Cl. at 490). But once more, even considering the facts in the light most favorable to the Tribe, the Tribe has not shown any evidence of mismanagement, and the Tribe seeks an accounting (*see* Appellant's Br. 55).

B

Ultimately, the Tribe seeks an accounting to discover what claims it may have, rather than an "accounting in aid of [the trial court's] jurisdiction to render a money judgment on that claim." *Klamath*, 174 Ct. Cl. at 490.

---

subsequent federal statutes reaffirming those obligations." J.A. 251 (Compl. ¶ 145). Considering the facts in the light most favorable to the Tribe, the trial court did not err in dismissing for lack of subject-matter jurisdiction because the Arthur Andersen report was received, and the Tribe could have ascertained whether it complied with the statute (*see Hopland Band of Pomo Indians*, 855 F.2d at 1577) no later than 2000. Thus, the Tribe's claim accrued well outside the Tucker Act's six-year statute of limitations.

Therefore, the trial court properly dismissed Counts I, II, IV, and V for lack of subject-matter jurisdiction.

## V

Construing all facts in the light most favorable to the Tribe, we also affirm the trial court's dismissal of Count III for lack of subject-matter jurisdiction under RCFC 12(b)(1). The Tribe's claim, deriving from the Secretary of the Interior's inaction in the late 1990s, accrued outside the six-year statute of limitations, and thus the Court of Federal Claims lacked jurisdiction to consider it. We also vacate the trial court's dismissal of Count III under RCFC 12(b)(6) because the Tribe stated a claim when it challenged the Secretary's failure to approve the 1998 proposed lease of the Tribe's *Winters* rights, but that claim is untimely.

## A

In *Arizona I*, the amount of water reserved to tribes under *Winters* was described as "water . . . intended to satisfy the future as well as the present needs of the Indian Reservations" and "enough water . . . to irrigate all the practicably irrigable acreage on the reservations." 373 U.S. at 600. In *Cappaert v. United States*, the Supreme Court described this as "reserv[ing] only that amount of water necessary to fulfill the purpose of the reservation, no more." 426 U.S. 128, 141 (1976).

*Winters* water rights are usufructuary, meaning "the property right consists not so much of the fluid itself as the advantage of its use." *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1357 (Fed. Cir. 2018) (cleaned up). We have explained that, as a result, "the Tribe has no right to any particular molecules of water, either on the Reservation or up- or downstream, that may have been used or diverted by the government." *Id.* (cleaned up). Therefore "[t]he Tribe's *Winters* rights, which give the Tribe the right to use sufficient water to fulfill the purposes of the Reservation, simply cannot be injured by government action that

does not affect the Tribe's ability to use sufficient water to fulfill the purposes of the Reservation." *Id.*

B

The Tribe alleges that the Secretary of the Interior's failure to approve the Tribe's proposed 25-year lease of 5,000 acre-feet of its *Winters* water rights was a Fifth Amendment taking and constituted a breach of trust. J.A. 238–43 (Compl. ¶¶ 112–18). The Tribe contends that other Tribes have been permitted to "market[], sell[], and/or leas[e] their water rights for off-reservation use" and the Secretary of the Interior's failure to approve their lease constituted disparate treatment in violation of 25 U.S.C. § 5123. J.A. 243–44 (Compl. ¶¶ 119–21). The Tribe seeks compensation and damages for all takings, misman-agement, and disparate treatment. J.A. 245 (Compl. ¶ 123).

The proposed lease agreement is dated January 31, 1998. J.A. 292 (Exhibit "I" to the complaint). The lease was submitted to the Secretary for approval. *See* Notice of Public Comment Period on Proposed Agreement for Leasing of Colorado River Water and Non-Irrigation of Lands on Chemehuevi Indian Reservation, 63 Fed. Reg. 33,945 (June 22, 1998); Notice of Public Comment Period on Proposed Agreement for Leasing of Colorado River Water and Non-Irrigation of Lands on Chemehuevi Indian Reservation, 63 Fed. Reg. 51,367 (Sept. 25, 1998) (second comment period). The Secretary of the Interior never approved or denied the proposed lease. *See* Appellee's Br. 39.

C

Considering the facts in the light most favorable to the Tribe, we conclude that the Tribe's legal challenge to the Secretary's inaction regarding the 1998 proposed lease was properly dismissed by the trial court for lack of jurisdiction,

as its claim accrued more than six years before it filed its first complaint in this action on April 20, 2010.[7]

A cause of action against the government first accrues, and the statute of limitations begins running, when "all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians*, 855 F.2d at 1577. There is no dispute that any failure to act on the Secretary's behalf occurred long before April 20, 2010, likely in 1998 or 1999, and that the Tribe was aware of this failure. *See* J.A. 238–39 (Compl. ¶ 112). Therefore, the Tribe's claim accrued no later than 2000, and is plainly barred by the six-year statute of limitations.

The Tribe relies on the continuing claims doctrine to support the timeliness of its claim. *See* Appellant's Br. 25–26; Appellant's Reply Br. 21–22. "In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997). By contrast, "a claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim." *Id.* Considering the facts in the light most favorable to the Tribe, we agree with the Government that the continuing claims doctrine does not apply: the Government's one-time failure to approve a lease in 1998 or 1999 cannot be broken down into "a series of independent and distinct events or wrongs" but instead

---

[7]    To the extent the Tribe seeks an "audit and full accounting by the Government" in connection with Count III, J.A. 244 (Compl. ¶ 122), the Court of Federal Claims lacked jurisdiction to award this relief for the reasons identified in part IV, *supra*.

is a "single distinct event." Therefore, the continuing claims doctrine cannot resurrect the Tribe's claim.

D

While we affirm the trial court's dismissal for lack of jurisdiction, we also conclude the trial court erred in dismissing Count III for failure to state a takings claim. *See Decision* at 217–18. The trial court stated that "[t]he Tribe has not alleged that the United States has taken any action which has prevented the Tribe from obtaining 11,340 acre-feet of mainstream water or the quantity of mainstream water necessary **for irrigation** of 1,900 acres of reservation land." *Decision* at 218 (alteration in original); *see also id.* at 218 (stating "the Tribe solely possesses the right to use a certain amount of water 'for irrigation.'" (quoting *Arizona v. California*, 376 U.S. at 344)). We agree with the Tribe (Appellant's Br. 34–39) and the Government (Appellee's Br. 31 n.9) that this is too narrow a reading of the Tribe's *Winters* rights.

The Tribe has the right to use the "amount of water necessary to fulfill the purpose of the reservation," and although the court need not decide the issue today, the Tribe's decision to lease the water off-reservation could "fulfill the purpose of the reservation." *Cappaert*, 426 U.S. at 141. Indeed, the Tribe alleges that other Tribes, namely the San Carlos Apache Tribe and the Gila River Indian Community, have been permitted to lease their water rights for off-reservation use. J.A. 244 (Compl. ¶ 121). Therefore, the trial court's dismissal of Count III under RCFC 12(b)(6) is vacated.

## VI

We have considered the Tribe's and the Government's additional arguments[8] and find them unpersuasive. For the reasons provided, we affirm the trial court's dismissal of Counts I–V of its complaint for lack of subject-matter jurisdiction.

**AFFIRMED**

COSTS

No costs.

---

[8]     We need not address the impact, if any, of the Indian Trust Accounting Statute on the tolling of the statute of limitations for any of these claims as none of the claims we have affirmed the dismissal of as time barred are "claims for losses or mismanagement of Indian trust funds." *See, e.g.*, *Wyandot Nation of Kansas v. United States*, 858 F.3d 1392, 1396 (Fed. Cir. 2017) ("During the period from 1990 through 2014, the Department of Interior Appropriation Act riders provided that claims for losses or mismanagement of Indian trust funds do not accrue until the affected Indian tribe or individual Indian has been furnished with an accounting of such funds.").